# EXHIBIT 16

# DEPOSIT ACCOUNT AGREEMENT



## Welcome to Chase

Thank you for opening your account with Chase; we look forward to serving you. Please keep this agreement for answers when you need them.

## About this Document

This document (may also be referred to as Account Rules and Regulations) contains the following three sections:

## Deposit Account Agreement

This section is your Deposit Account Agreement, or contract, with us.

The Deposit Account Agreement also includes these separate documents that pertain to our personal and business accounts:

- Rates for interest-bearing accounts
- Personal accounts:
  - Consumer Banking Products: Additional Banking Services and Fees (including our Fee Schedule)
  - Chase Private Client Products: Deposit Products and Services
- Business accounts:
  - Additional Banking Services and Fees (including our Fee Schedule)
- Any additional disclosures, such as amendments or agreements, that we provide to you either when you open your account or when we change the terms of your account.

## Privacy Notice

The Privacy Notice explains how we keep information about you private and secure, and what choices you have pertaining to how we use your information.

## How to Contact Us

We're always here for you. The last page of this agreement shows how to reach us.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 1 of 24
Effective 11/11/2018
**CHASE000388**

Exhibit 2
Name: Huffman
Meri Coash 10-27-23

## *Table of Contents*

**DEPOSIT ACCOUNT AGREEMENT** .......................................................................................................... **3**

**General Account Terms** ............................................................................................................. **3**

  A. Deposits and Checks You Cash ...................................................................................3

  B. Checks, Withdrawals, Transfers and Other Account Charges..................................5

  C. Overdrafts and Fees; Overdraft Protection; Setoff and Security Interest ..............6

  D. CDs .................................................................................................................................7

  E. Statements, Notice of Errors, and Other Notices .....................................................9

  F. Forms of Account Ownership .....................................................................................9

  G. Interest on Checking and Savings Accounts ...........................................................11

  H. Closing Your Account ................................................................................................12

  I. Other Legal Terms .....................................................................................................12

**Substitute Checks and Your Rights** ......................................................................................... **16**

**Electronic Funds Transfer Service Terms** ................................................................................. **16**

  A. Types of EFT Services ................................................................................................16

  B. Important Information and Agreements about Your Card .......................................17

  C. Limitations on Transfers, Amounts, and Frequency of Transactions .....................18

  D. Receipts and Statements ...........................................................................................18

  E. In Case of Errors or Questions about Your Electronic Funds Transfers .................18

  F. Our Liability for Failure to Complete Transactions ................................................19

  G. Preauthorized (Recurring) Transfers and Stop Payments ......................................19

  H. Disclosure of Account Information to Third Parties ................................................19

  I. Notice of Your Rights and Liabilities .......................................................................19

  J. Fees ............................................................................................................................. 20

  K. Services Not Covered by This Part; Separate Agreements ..................................... 20

**Account Alerts and Text Banking** ........................................................................................... **20**

**Funds Availability Policy** ......................................................................................................... **20**

**PRIVACY NOTICE** ......................................................................................................................... **22**

**HOW TO CONTACT US** .................................................................................................................. **24**

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 2 of 24
Effective 11/11/2018
**CHASE000389**

# Deposit Account Agreement

This agreement is the contract that governs your account.

Whether you have a personal or business deposit account, this document is the basic agreement between you and us (JPMorgan Chase Bank, N.A. or "Chase"). By signing a signature card or submitting an account application, or by using any of our deposit account services, you and anyone else identified as an owner of the account agree to the terms in this agreement. Customers of some of our business groups, such as Corporate Banking, will get a different agreement and their accounts will be governed by that agreement, not this one. If you have a product that is not a deposit account, such as a prepaid card or credit card, this agreement does not apply to that product. Also, other products or services, such as online banking or retirement accounts, may have additional agreements. A more specific agreement takes precedence over this one.

This agreement also refers to and includes other disclosures we may provide to you, including (1) product information, (2) rate information, (3) banking services and fees, and (4) other disclosures, agreements, and amendments that we may provide to you. All may contain information on fees that apply to your accounts. Products and services as well as associated fees, charges, interest rates and balance requirements may differ among different geographic locations. Not all products and services are offered at all locations.

## DEFINITIONS:

Here are some important terms that we use throughout this agreement:

**Account:** Any deposit account, such as a checking or savings account, you have with us that is covered by this agreement.

**ACH (Automated Clearing House):** An electronic deposit to, or withdrawal from, your account that we receive or send through the "automated clearing house" network. Common examples include a direct deposit of payroll and a one-time or recurring payment to a utility company.

**ATM (Automated Teller Machine):** An electronic device that provides many of the same services as a teller, including withdrawals and deposits.

**Available balance:** Your previous day's balance plus any pending credit transactions (excluding pending debit card purchase returns), such as ACH direct deposits minus:

- Pending charges such as debit card purchases, electronic payments or other transactions that we are legally obligated to pay or have already paid,
- Amount of deposits that are not yet available for withdrawal under our Funds Availability Policy,
- Any holds on your balance, such as holds on funds to comply with court orders or other legal requirements.

**Business day:** Every day except Saturdays, Sundays and federal holidays. Some branches may close on a business day due to an emergency or to observe a state holiday.

**Check:** A written order to pay a specific amount of money drawn on, payable through, payable at or processed by a bank or other depository institution. If a check is sent or returned as an electronic image or as a substitute check, it is still considered a check.

**Debit card transaction:** Any purchase or bill payment using your debit card. A debit card transaction may be either an everyday (not recurring) purchase transaction or a recurring payment, such as a monthly bill.

**Direct deposit:** An automatic electronic deposit made through the ACH network to your account by someone else, such as an employer issuing payroll or a government paying benefits.

**Hold on your account:** Any amount of money that is in your balance but that you cannot withdraw because of delayed funds availability, a court order or other reasons. A hold may be placed for more than your balance.

**Item:** Any check, ACH, funds transfer, teller cash withdrawal, ATM withdrawal, debit card purchase, fee, charge or other amount that is added to or subtracted from your balance.

**Overdraft/Overdrawn:** A negative balance, or the amount by which all the items presented to us on a business day exceed the available balance.

**PIN:** A four-digit personal identification number that you either select or request us to randomly generate and mail to you. A PIN is needed to have full use of a debit card and ATM card.

# General Account Terms

## A. Deposits and Checks You Cash

### 1. Direct deposits; notice of electronic deposits

When we receive an electronic deposit to your account, the only notice you will receive from us is on your next statement. You may visit chase.com or Chase Mobile® and use Account Alerts, or call us to confirm that we have received a deposit.

If the bank that sent an electronic deposit to your account tells us it was a mistake, or was intended for another customer or account, we may deduct the amount from your balance without investigating.

### 2. Endorsements

An endorsement is a signature, stamp or other mark made on a check to transfer the check to another person. If a check you deposited doesn't have your endorsement, we may endorse it for you or treat the check as if we had endorsed it. Either way, the effect will be as if you had endorsed the check. Also, any deposited check that appears to contain your stamped or facsimile endorsement will be treated as if you had actually endorsed it. We are not bound by any conditional or restrictive endorsements on a check you cash or deposit, or by any endorsement "without recourse."

### 3. Endorsement requirements

To help ensure that checks you deposit or cash will be processed timely, your endorsement (and any other endorsement supplied by a co-payee) must be in the 1½ inch area that starts on the right side as viewed from the back. Payee or customer information must not be on any other part of the back of the check (look at the diagram):

If you don't endorse your check properly and it causes us a loss, cost or expense, you have to pay that amount to us.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 3 of 24
Effective 11/11/2018
**CHASE000390**

## 4. Deposit records and receipts

We may rely on the account number on any deposit slip or similar record we receive, even if that account number is associated with a name that's different from the name you've provided. It's not our responsibility to detect any inconsistency between the account number you provide and the name.

If you make a deposit, we may provide a receipt, but the amount on your deposit receipt is based entirely on the deposit slip you complete. We may confirm the funds you deposit and, after review, may adjust your account for any errors including any errors on your deposit slip.

If we give you a receipt for a CD that you decide not to open or we give you a receipt for a deposit that you then cancel, the receipt is void and you may not claim those funds.

## 5. Night depository and large cash deposits

Any of our employees may open and count any deposit that a teller didn't count in front of you, including night depository deposits and large cash deposits, and you agree not to dispute that employee's determination of the amount you deposited.

If you use our night depository, you are responsible for any disappearance, theft or loss of any envelope, bag or money before we issue a written receipt for the deposit.

## 6. Our right to refuse deposits

We may refuse a deposit, or part of a deposit, at any time. We also may refuse a deposit after initially accepting it. We can reverse any amount we've added to your balance for a deposited check and send the check on a collection basis even after we've taken physical possession of the check. We will not be liable to you for refusing a deposit, even if it causes us to decline any transactions you have already made. If we refuse a deposit, we may take a check on a "collection basis," which means we won't add funds to your balance until we've  actually been paid for the check.

## 7. When you can withdraw funds you've deposited

Generally, for checking and savings accounts, you may withdraw funds the next business day after the business day you deposit them. But in some cases you may not. Please see the *Funds Availability Policy* for details.

If funds from a deposit become available and you can withdraw them, that does not mean the check or other item you've deposited is "good," has "cleared," or has been paid by the paying bank. It's possible that the item will be returned unpaid months after we've made the funds available to you and you've withdrawn them. No one, including our employees, can guarantee to you that a check will not be returned.

## 8. Transactions in a foreign currency

Any transaction we conduct for you in a foreign currency, such as sending or receiving a wire transfer to or from another country, depositing a foreign check, or exchanging foreign currency in our branches, will use an exchange rate. Currency exchange is only available at a limited number of branches and in certain currencies. The foreign exchange rates we use are determined by us in our sole discretion. The exchange rate we use will include a spread and may include commissions or other costs that we, our affiliates, or our vendors may charge in providing foreign currency exchange to you. The exchange rate may vary among customers depending on your relationship, products with us, or the type of transaction being conducted, the dollar amount, type of currency, and the date and time of the exchange, and whether the transaction is a debit or credit to your account. You should expect that these rates will be less favorable than rates quoted online or in publications.

We are not required to accept for deposit checks that are drawn on a non-U.S. bank or payable in a foreign currency. We may accept those checks on a collection basis without your specific instruction to do so. We can reverse any amount we've added to your balance and send the check on a collection basis even after we've taken physical possession of the check. Our Funds Availability Policy does not apply to any foreign check, whether we accept it for deposit or on a collection basis. The actual amount you receive for checks payable in a foreign currency will be determined at the exchange rate for such items that's in effect when we're paid for the check. If a check is returned later for any reason, we will subtract the amount of the check and any charges from other banks from your balance. We will use the applicable exchange rate in effect at the time of the return, which may be different from the exchange rate originally used for the deposit.

## 9. Depositing substitute checks

A substitute check is a copy of a check that is the legal equivalent of the original check. You may receive a substitute check, such as when a check you deposited is returned unpaid. If you deposit a substitute check and we suffer a loss, cost or expense as a result, you will have to pay us that amount.

## 10. Depositing remotely created checks

A remotely created check is created by the payee and not signed by the account holder. It states that the account holder authorized the check. If you deposit a remotely created check, you guarantee it was authorized by the account holder for payment in the amount it shows.

## 11. Our responsibility for collecting deposits

If you deposit or cash a check, or we send one for collection, we act only on your behalf. Our only responsibility is to exercise reasonable care. We will not be liable for the lack of care of any bank or third party we use to collect checks, or for checks lost during shipping. We may send checks to any bank or to the entity on which the check was written in our customary manner. We may have agreements with other banks regarding times and methods for collecting or returning items.

If we lose a check, you agree to use reasonable efforts to help us locate or replace it.

Although we attempt to identify and prevent fraudulent transactions, we have no duty to you to determine whether any check you deposit or  cash is forged, counterfeit, altered, improperly endorsed or otherwise improper.

## 12. Our right to charge back deposited or cashed items

If you deposit or cash a check or other item and (1) the paying bank returns it to us unpaid; (2) the paying bank or the issuer of a check demands that we repay them because the check was altered, forged or unauthorized, is missing a signature or endorsement, or has a forged endorsement; or (3) the sending bank or the originator of an item demands that we return the item because it was unauthorized, sent to the wrong account number or procured by fraud, we may pay the return or demand, and subtract the funds from your balance. If we have reason to believe that any of the events in the previous sentence has occurred or may occur or that the check or other item should not have been paid or may not be paid for any other reason, we may place a hold on the funds or move them to a non-customer account until we determine who is entitled to them. If a deposited or cashed item is returned, we will charge you a Deposited Item Returned Fee or a Cashed Check Returned Fee.

If you deposit a check or other item in your trust account (including any attorney trust account) and it is returned, we may charge your trust account or an account in your name, or charge part of the check to each, even if you have already withdrawn the funds.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 4 of 24
Effective 11/11/2018
**CHASE000391**

## B. Checks, Withdrawals, Transfers and Other Account Charges

### 1. Withdrawals and transfers from your account
We may subtract from your balance the amount of any check or other item that you or any person you authorize created or approved. We may require you or any person you authorize to provide us with identification, documentation or information that's acceptable to us before allowing the transaction.

### 2. Checks and other documents you use
We're not responsible for losses or delays that result from improper printing on checks or other account documents that you obtain through someone other than us. We may refuse to accept for deposit or to pay checks that we cannot process or photograph using our customary equipment.

### 3. Protecting your checks
You must protect your checks and other account documents and information from theft and unauthorized use. You must write your checks in a way that prevents someone else from completing, altering or adding to them without your authorization. If you become aware that any checks or other documents and information, such as statements, have been lost or stolen, you must notify us immediately. If you fail to do any of these things, such as leaving your checks where they can easily be stolen, we are not responsible for any losses that may result.

### 4. Incomplete, future-dated, conditional or stale-dated checks
You agree not to write a check that's incomplete or tries to limit the time or method of payment with a condition, such as "Void after 180 days" or "Valid only for $1,000 or less." We have no duty to discover, observe or comply with such checks. If we pay a conditional check, the conditions do not apply to us. We may choose to pay or not to pay a stale-dated check (dated more than six months before it is presented), regardless of how old it is. If we pay it, you will be responsible for the check. We may pay any future-dated check submitted for payment.

### 5. Multiple signatures
We are not required to comply with any multiple-signature requirement, either on personal or business accounts, even if your signature card specifies that multiple signatures are required or you have otherwise instructed us to do so. A multiple-signature requirement is for your internal control purposes only.

### 6. Facsimile signatures
We may pay a check bearing any form of facsimile or computer-generated signature. If you use a facsimile or computer-generated signature, or provide a signature card authorizing any such signature, you will be solely responsible for any check bearing a similar signature, regardless of your negligence or whether the signature was the same one you previously used.

### 7. Check cashing
If a person who is not our deposit or loan customer tries to cash your check at any of our branches, we may charge them a fee or refuse to cash it. We may also require that they provide us identification we deem acceptable.

### 8. Large cash withdrawals
We may place reasonable restrictions on when and how you make any large cash withdrawal. We may also require that you sign a document releasing us from any liability if you are robbed or assaulted. We may refuse the withdrawal request if you do not agree with these conditions.

### 9. Review of checks and signatures
Check payment is highly automated, and we pay millions of checks every day. Although we inspect some checks, you agree that reasonable commercial standards don't require us to do so. If we return a check because we believe it doesn't match your signature on file with us, we're not liable to you even if you authorized the check. If the numeric amount on a check doesn't match the amount written out in words, we may select either one when paying it. We have no duty to prevent a check from being presented more than once.

### 10. Notice that a check has been deposited or cashed
If we're notified that a check drawn on your account has been deposited or cashed at another bank, we may place a hold on your account for the check amount, which may cause other items to overdraw the account. If the amount of the check identified in the notice exceeds your balance at the time we receive the notice, we may notify the other bank of that fact.

### 11. Account numbers on funds transfers
If you instruct us to send a funds transfer, such as a wire or ACH transfer, we and every other bank involved in the transfer may rely on any bank number or account number you provide. If the funds transfer instruction gives both a bank number or account number and a name, and the name identifies a different person from the bank or account owner identified by number, we and other banks that handle the funds transfer may still rely exclusively on the number. We have no duty to detect any inconsistency between the bank number or account number and the name.

### 12. Fees
You agree to pay all fees applicable to your account. We provided you a schedule of fees when you opened your account, and we will notify you of any changes. We may subtract these fees from your balance, even if the fee makes your balance negative.

### 13. Stop payments on a check
If you request us to stop payment on a check, we will charge either a Stop Payment Fee or an Online or Automated Phone Stop Payment Fee depending on how you request your stop payment. However, your stop payment will not be effective if we have already certified, paid or otherwise become responsible for the check. For example, we can't stop payment on a check we've already cashed or a deposited check where the funds have already been withdrawn. Refer to the *Electronic Funds Transfer Service Terms* for how to place a stop payment on recurring electronic payments.

You may request a stop payment by calling us, in person, or through chase.com or Chase Mobile. So we can identify the item, you must give us the exact account number and either:

- The exact check number or a range of check numbers
- The payee name and the exact amount of the check
- The payee name and range of amounts of the check.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 5 of 24
Effective 11/11/2018
**CHASE000392**

Generally, we will complete your request as soon as we receive your instructions.

For personal accounts, your stop payment request lasts for one year even if the check is presented more than once unless you cancel your stop payment request. However, you may place a new stop payment order, which will be effective for one calendar year from the day you place the additional order. An additional fee will be charged.

For business accounts, you may place a stop payment for either:

- One calendar year with automatic renewal annually for up to six additional years. We will list scheduled renewals on your business account statement 60 to 90 days in advance. The stop payment will be renewed, and you will be charged a Stop Payment-Automatic Renewal Fee, unless you notify us not to renew by following the instructions in the statement, or
- One calendar year (this option is not available for stop payments initiated on chase.com).

We may send you a written confirmation of your stop payment. We may rely on the information in the confirmation unless you notify us immediately of any errors. When the stop payment order expires, we may pay the item and have no duty to notify you.

We are not required to accept a stop payment on a cashier's check, teller's check (official check) or certified check, unless you provide us a sworn statement—in a form we deem acceptable—that the check is lost, stolen or destroyed. After you place a stop payment, we are not required to refund the check amount or issue a replacement check until at least 90 days after the issue date. We are not required to refund the check amount or issue a replacement check if the check is presented for payment within 90 days after the issue date.

## 14. Limits on savings account withdrawals
Federal regulations limit the number of withdrawals and transfers out of your savings account. In this agreement, a savings account means an account with limited withdrawal privileges, including a money market account. During any monthly statement period, you may make no more than six withdrawals or transfers (for example by check, ACH, telephone, Internet or Overdraft Protection transfer) out of these accounts. However, this limit does not apply to withdrawals made at a branch or at an ATM, by mail (by check payable and mailed to you) or by messenger. We are required to ensure that you comply with this limit. If you exceed this limit after we've notified you of a violation, we will change your account to one we choose that doesn't limit withdrawals, and it may be an account that pays less or no interest. For Retirement Money Market accounts, we may either refuse or delay any withdrawal request that violates these requirements.

## 15. Savings Withdrawal Limit Fee
If you make more withdrawals or transfers out of your savings account than your account terms permit in a monthly statement period, we will charge a Savings Withdrawal Limit Fee. This fee is based on all withdrawals and transfers, not only those that are limited by federal regulation.

## 16. Our right to require advance notice of withdrawals
For all savings accounts and all personal interest-bearing checking accounts, we reserve the right to require seven days' prior written notice of withdrawal.

## 17. Death or incompetence of account owner or sole signer
Tell us immediately if any account owner dies or is declared incompetent by a court. We may act as if all owners are alive and competent until we receive notice otherwise.

After we receive notice of death or incompetence, we may freeze your balance, refuse to accept transactions, and reverse or return deposits. We are also not required to release your funds until we receive any documents we reasonably request to verify your death or incompetence, as well as who is entitled to the funds. If you die while residing outside the United States, we may require a personal representative to be appointed by a court in a United States jurisdiction. If we have any tax liability because of paying your balance to your estate, the estate will be responsible for repaying us the amount of that tax. If an account owner authorizes any transaction, but it's not presented for payment until after that owner dies, we are authorized to pay the transaction. If you owe us a debt at the time of your death, we are authorized to exercise our right of setoff (our right to apply funds in one account to the debt associated with another account) or security interest rights against the funds credited to your balance after your death. We have these rights even if a surviving joint owner, a "payable on death" payee, or a beneficiary of an "in trust for" or "trustee for" account has rights to the account.

After we receive notice of death or incompetence of the sole signer on a business organization's account, we may freeze the account balance, refuse to accept transactions, and reverse or return deposits. We are also not required to release the organization's funds until we receive any documents we reasonably request to verify the death or incompetence of the signer and to establish a new person's authority to act on behalf of the organization in transacting on or closing the organization's account.

## 18. Autosave feature
You can set up automatic transfers to your personal savings account from your personal checking. Use the Chase Mobile app or chase.com to set up, review, change or cancel your transfers.

We will not be liable to you for our failure to transfer funds under any Autosave feature that you select, for any reason, including system outages or defects. In particular, we will not be liable for any interest you might have earned on the savings account if the funds were not transferred.

## C. Overdrafts and Fees; Overdraft Protection; Setoff and Security Interest

## 1. Overdrafts
We may pay or decline to pay any item if your available balance is less than the amount of that item plus all other items received but not yet paid. We will decline any requested ATM withdrawal unless your available balance at the time is equal to or more than the amount of the requested withdrawal. Even if we've paid overdraft items before, we are not required to do it in the future. Special rules for everyday debit card transactions are described in the *Electronic Funds Transfer Service Terms*. We rely on the transaction coding sent to us by the merchant or other third party in determining whether the transaction is "everyday" or recurring.

We look at your balance only once to decide if the item would cause an overdraft.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 6 of 24
Effective 11/11/2018
**CHASE000393**

Generally, for each business day, we will first add deposits to your account. Second, we will subtract wire transfers, everyday debit card transactions, online banking transactions, ATM withdrawals, teller cash withdrawals, and checks you wrote that are either cashed or deposited at a teller station by a Chase employee, in the order in which they are authorized, withdrawn, cashed or deposited. Lastly, we will subtract all other items, including checks you wrote that are either cashed or deposited at an ATM, starting with those having the highest dollar amount and moving to the lowest. We reserve the right to use a different order in certain states.

It's your responsibility to avoid overdrawing your account.

## 2. Your responsibility to repay overdrafts

You must immediately pay the amount of any overdraft along with any fees that apply. If you don't, you may be charged additional fees or interest. We also may report you to consumer reporting agencies, close your account, or both. This could affect your ability to open accounts with us or other banks in the future.

You authorize us to use the money from any subsequent deposits to your account to pay any overdraft and resulting fees. Subsequent deposits include any federal or state benefit payments that you choose to deposit in any account (including direct deposit of Social Security benefits). You understand and agree that if you don't want your benefits applied in this way, you may change your direct deposit instructions at any time.

You agree to pay all costs and expenses we incur in collecting any overdraft. We may still pursue collection of the amount you owe (including suing you) after it is charged off.

## 3. Insufficient Funds and Returned Item fees

We may charge a fee for any item presented on a business day when your account is overdrawn, whether or not we pay the item. If we pay it, we will charge an Insufficient Funds Fee. If we return it, or decide later to pay an item after we had initially decided to return it, we will charge a Returned Item Fee. Special rules for everyday debit card transactions are described in the *Electronic Funds Transfer Service Terms*.

We may limit the number of Returned Item and Insufficient Funds fees we charge for a business day. We may charge interest on any overdraft balances that you haven't repaid promptly. Refer to your Fee Schedule for information about what fees apply and how fees are calculated for your account.

## 4. Overdraft Protection

Overdraft Protection allows you to link one of your accounts as your backup account to your checking account to help pay an overdraft. If your checking account does not have enough money, we will use the available funds from your backup account to authorize or pay transactions.

**Establishing or Canceling Overdraft Protection:** Any owner of both the checking account AND the backup account may enroll in Overdraft Protection without the consent of other owners. Any owner of the checking account OR the backup account may cancel Overdraft Protection without the consent of other owners. A backup account can provide Overdraft Protection for more than one checking account, but a checking account can have only one backup account. A personal checking account may be linked to a Chase personal savings account; and a business checking account may be linked to a Chase business savings account or a business line of credit in good standing. We may cancel your Overdraft Protection service at any time by sending you written notice. Your request to add or cancel Overdraft Protection will become effective within a reasonable time after approval.

**Transfers:** We will make one Overdraft Protection transfer per business day. If you have enough available funds in your backup account, we will automatically transfer enough to bring your checking account balance to zero. If you do not have enough available funds in your backup account to bring your checking account balance to zero, but you have enough available funds to pay one or more transactions and/or your previous day's negative balance, we will transfer that amount. If the amount transferred does not bring your checking account balance to zero, your checking account will become overdrawn and you may be charged Insufficient Funds or Returned Item Fees. If we authorize your transaction, we will leave the funds in your backup account until we pay the transaction, which may take several days. However, if you use those funds before the transaction is paid there will not be available funds to make the transfer and your checking account may become overdrawn and charged an Insufficient Funds fee. The available balance for a savings account is determined at the time that we authorize a transaction or at the end of business day processing. The available balance for a business line of credit is determined at the end of the previous business day processing. We are not required to notify you if your funds are available but the backup account becomes blocked, for example if the account is dormant, purged, restricted or not in good standing. *Refer to the section Restricting your account; blocking or delaying transactions* for additional information. Transfers will appear on your statement for both accounts.

Withdrawals and transfers out of your savings account, including Overdraft Protection transfers, are limited by federal law. In addition, Overdraft Protection transfers may result in Savings Withdrawal Limit Fees. Both of these limits are explained in more detail in sections *Limits on savings account withdrawals* and *Savings Withdrawal Limit Fee*.

## 5. Setoff and security interest

If you owe a debt to us or any of our affiliates (either now or in the future), you grant us a right of setoff to, and a security interest in, all of your accounts to secure the debt. Debts include any overdrafts or fees you owe, as well as amounts owed us by another person or entity if you have guaranteed that you will pay their debts. If the debt is due or overdue, we may use the funds in any of your accounts to pay all or part of the debt. If your account is a joint account, we may use the funds in the joint account to pay the debt of any account owner. Our security interest will be governed by Uniform Commercial Code Article 9, whether Article 9 applies by its terms or not. We do not have to give you any prior notice to apply the funds. You expressly agree that our rights extend to any electronically deposited federal or state benefit payments (including Social Security benefits). If you don't want your benefits applied in this way, you may change your direct deposit instructions at any time with the person or organization paying the benefits. The right of setoff does not apply if the debt is created under a personal credit card plan.

If any federal benefits or other payments are deposited to your account after you become ineligible to receive them, we may setoff against any of your accounts to recover the payments if we're obligated to return funds to the payor.

## D. CDs

A certificate of deposit, or CD, is a deposit account with us for a specified period of time. This disclosure covers both retirement and non-retirement CD products. By opening your CD, you agree to keep the amount deposited (principal) on deposit.

Here are a few things you should know about CDs:

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 7 of 24
Effective 11/11/2018
**CHASE000394**

**Term:** The term is the number of days, months or years you agree to leave your money in the account.

**Maturity date and grace period:** The maturity date is the last day of your CD's term. The grace period is the 10 days after the maturity date for CDs with a term of 14 days or longer. On the maturity date or during the grace period you can change the term of your CD, make additional deposits (for non-retirement CDs only), or withdraw your CD principal without paying an early withdrawal penalty.

**Automatically renewable CD:** An automatically renewable CD will renew on the maturity date for the same term unless we notify you otherwise or you change or close the account. Once your CD renews, any reference to the maturity date means the last day of the new term. For the renewal term, your CD will earn interest for the term and amount at the CD standard rate unless you qualify for the CD relationship rate. If your CD is closed during the grace period, it will not earn interest after the maturity date.

**Single maturity CD:** A single maturity CD will not automatically renew on the maturity date and won't earn or be paid interest after that date.

**Interest:** We use the daily balance method to calculate interest on your CD. This method applies a periodic rate each day to your balance. Interest begins to accrue on the business day of your deposit. Interest for CDs is calculated on a 365-day basis, although some business CDs may calculate interest on a 360-day basis. The Annual Percentage Yield (APY) disclosed on your deposit receipt or on the maturity notice assumes interest will remain on deposit until maturity. On maturities of more than one year, interest will be paid at least annually.

You may withdraw any paid or credited interest without penalty during your CD's term or at maturity. On the maturity date, interest will become principal of the renewed CD. A withdrawal will reduce earnings.

**Early withdrawal penalties: There is a penalty for withdrawing principal prior to the maturity date.**

**For Personal CDs:**
- If the term of the CD is less than 24 months, the early withdrawal penalty is 1% of the amount withdrawn, but not more than the total amount of interest earned during the current term of the CD.
- For terms 24 months or more, the early withdrawal penalty is 2% of the amount withdrawn, but not more than the total amount of interest earned during the current term of the CD.
- If the withdrawal occurs less than seven days after opening the CD or making another withdrawal of principal, the early withdrawal penalty will be calculated as described above, but it cannot be less than seven days' interest.
- The amount of your penalty will be deducted from principal.

**For Business CDs:**
- If the term of the CD is less than 12 months, the early withdrawal penalty is equal to $25 plus 1% of the amount withdrawn.
- For terms of 12 months or more, the early withdrawal penalty is equal to $25 plus 3% of the amount withdrawn.
- If the withdrawal occurs less than seven days after opening the CD or making another withdrawal of principal, the early withdrawal penalty will be calculated as described above, but it cannot be less than seven days' interest.
- The amount of your penalty will be deducted from principal.

**Waiving early withdrawal penalties.** We will waive early withdrawal penalties in these circumstances:

**For Personal CDs:**
- Death of a CD owner or a grantor of a revocable family/living trust;
- Disability of a retirement CD owner;
- A court's determination that a CD owner is incompetent;
- Re-titling of a CD (excluding a retirement CD) to transfer ownership of funds into a living trust without moving funds from the bank and where no change in term or rate occurs; and
- For retirement CDs, if the owner is 59½ or older and the funds are taken as an IRS-reportable distribution via cash, check, or deposit or transfer to a non-retirement account. This waiver does not apply if the transfer is to a retirement account at another financial institution.

We will also waive early withdrawal penalties under the circumstances described below. However, if these withdrawals occur less than seven days after the account was opened or a previous withdrawal was made, the withdrawal penalty will apply.
- Disability of an owner of the CD (excluding a Retirement CD);
- For retirement CDs, if the owner is under age 59½ and one of the reasons defined by sections 72(t) and 530 of the Internal Revenue Code applies, such as payment of qualified education expenses or first-time home purchase expenses; and
- For retirement CDs, if the owner is withdrawing an excess annual retirement contribution amount and any corresponding earnings.

**For Business CDs owned by a sole proprietorship:**
- Death of a CD owner or a grantor of a revocable family/living trust;
- A court's determination that a CD owner is incompetent;
- Re-titling of a CD to transfer ownership of funds into a living trust without moving funds from the bank and where no change in term or rate occurs;
- Disability of a CD owner. However, if these withdrawals occur less than seven days after the account was opened or a previous withdrawal was made, the withdrawal penalty will apply.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 8 of 24
Effective 11/11/2018
**CHASE000395**

## E. Statements, Notice of Errors, and Other Notices

### 1. Statements and notices

We will make available an account statement for checking and savings accounts monthly, unless your account has no activity, other than the payment of interest, we may not make a statement available.

A "statement period" means the period covered by your account statement. If you receive a statement monthly, the monthly statement period may or may not be a calendar month, but in most cases it won't be more than 32 days or less than 28. The specific dates covered by your account statement will be on your statement.

Checking and savings statements are available through chase.com or Chase Mobile unless the product information indicates otherwise. You will receive statements by mail unless you choose paperless statements. We have made the statement available to you on the day we notify you that the paperless statement is available or we mail your paper statement. If your address or email is not valid, the statement will be considered available to you on the day we generated it.

If you receive paper statements, we will send statements to the current address listed on our records. Statements will be sent via standard U.S. mail. We may change your mailing address of record if we receive an address change notice. If we do so, we'll notify you.

We may send you other notices related to your account. If you are enrolled with chase.com or Chase Mobile, some notices may only be available electronically. We send some notices only in paper form. You agree that sending the statement or notice to one owner qualifies as sending it to all owners, even if all owners don't have access to the mailing address of record for the account.

### 2. Notice of errors, forgeries and unauthorized signatures

You must notify us in writing within 30 days after we mail a statement or otherwise make a statement available (for example, paperless statements) if:

- An item that you did not authorize or that is altered is listed on the statement;
- Your account statement contains any errors; or
- You did not receive your scheduled statement.

You must notify us in writing of any unauthorized, improper or missing endorsements within six months after the account statement is mailed or made available.

You must provide us with all information we need to investigate the alleged error or item. You must also file any police reports and provide any supporting affidavits and testimony we reasonably request.

If you do not comply with the requirements above, we are not required to reimburse you for any claimed loss, and you cannot bring any legal claim against us in any way related to the item or errors. In addition, if you fail to notify us of any unauthorized item within 30 days (14 days in New York) after we mail, or in any other way make available, a statement that lists an unauthorized item, we are not required to reimburse you for unauthorized items by the same person that we pay after that time. These requirements do not apply to personal account transactions covered by the *Electronic Funds Transfer Service Terms*. You also have certain rights under federal law for substitute checks; please see *Substitute Checks and Your Rights* for more information.

### 3. Options for receiving checks

We offer three choices for how you can view or receive copies of checks you've written or authorized:

- "Check safekeeping" means we keep images of your checks, which are available through chase.com. We do not include your paid checks or images of them with your statement. Some accounts require check safekeeping.
- "Image statement" means you will receive images of the front of your paid checks on your account statement.
- "Check enclosure" means we return legal copies of your paid checks with your account statement. This feature is not offered on all accounts.

If you have multiple personal checking accounts on a single statement and one of them uses check enclosure, all others will use check safekeeping. You agree that when we send a statement we have made the check available to you, even if we do not send originals or images with the statement. We will destroy original checks after a reasonable period of time we determine.

If for any reason we can't provide a copy of your check, you agree that we will not be liable for more than the face amount of the check. We cannot provide originals or images of checks that are sent to us as electronic transfers. Additionally, other banks may send us electronic images instead of original checks, so we can provide a copy of the image, but not the original check.

## F. Forms of Account Ownership

### 1. Personal accounts

THE TYPE OF ACCOUNT OWNERSHIP MAY CHANGE HOW YOUR FUNDS ARE PAID IF YOU DIE, EVEN IF YOUR WILL STATES OTHERWISE. PLEASE CONSULT YOUR ESTATE PLANNING ADVISOR OR ATTORNEY ABOUT YOUR CHOICES.

If your account is a type listed under "Personal Accounts" in our product information, you agree not to use it for business purposes. Ownership of your account is determined by the most current signature card. However, we are authorized to rely on the account ownership information contained in our deposit system unless we are notified that the most current signature card and the deposit system contain different information.

#### i. Solely owned account

When only one individual is listed as the owner of an account, we will treat the account as a solely owned account.

#### ii. Joint accounts

When two or more people are listed as owners of a personal account, the account is a "joint account" and each owner is a "joint owner."

If your joint account becomes overdrawn, you're liable for the full amount of the overdraft, regardless of whether you initiated or benefited from the item(s) that caused the overdraft.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 9 of 24
Effective 11/11/2018
**CHASE000396**

If one joint owner requests that we not pay items authorized by a different joint owner, we may block the account, but we are not required to do so. That means we will refuse to pay all items, including items authorized by the owner making the request. If we block the account, we may not release the block unless all joint owners agree in writing to remove it. No request to block the account will affect items that we paid before the request. If we decide not to block the account, all joint owners remain responsible for items subtracted from the account.

Any joint owner may close the account. We may choose whether or not to act upon other instructions of any joint owners, including adding another owner to the account, without the signature of the other joint owners. We may also pay all or any part of the funds in the account to a court or government agency if we receive a garnishment, levy or similar legal process that identifies any of the joint owners.

### a. Joint account with rights of survivorship

If a joint account has rights of survivorship, and one joint owner dies, the account will be paid to the surviving joint owners. The estate of the deceased owner will have no rights to the account. If there is more than one surviving joint owner, the account will continue as a joint account with rights of survivorship among the remaining owners. If an account is designated "JAWROS" or "JTWROS," it has rights of survivorship.

### b. Joint account with no right of survivorship (also called "tenants in common")

If a joint account does not have rights of survivorship, and one joint owner dies, that owner's interest passes to the owner's estate. Either the surviving joint owners or the deceased owner's estate may withdraw the funds at any time, and we have no responsibility for determining the respective interests of the owners. If an account is designated "Tenants in common" or "JTIC," it does not have rights of survivorship.

### c. When survivorship rights apply

Except as otherwise stated in this paragraph, a joint account has rights of survivorship unless you clearly indicate on the signature card and in the account title that the account is created without these rights. Accounts in Louisiana do not have rights of survivorship. Accounts in Texas do not have rights of survivorship unless you clearly indicate on the signature card and in the account title that the account is created with these rights.

If a joint account also contains a "payable on death" or "in trust for" designation, the account always includes a right of survivorship and is payable to the beneficiary only upon the death of the last surviving owner, except as stated in paragraph d. below.

### d. Marital account (Wisconsin only)

If one owner of a marital account dies, the survivor is entitled to 50% of the account funds and the estate of the deceased is entitled to the other 50%. If a marital account contains a payable on death designation, the POD beneficiary is entitled to the deceased spouse's 50% share. However, we have no responsibility to determine the respective interests of the owner and the POD beneficiary.

### e. Tenants by the entirety (Florida only)

A Florida joint account owned solely by two spouses is a "tenants by the entirety" account unless the signature card indicates otherwise. We are not required to determine whether an account is a tenants by the entirety account before responding to a garnishment or other legal process. We may assert our right of setoff or security interest in a tenants by the entirety account in order to collect debts of either owner.

## iii. "Payable on death" account

If you establish your account payable on death to one or more beneficiaries, the account is a "POD" account. If we receive proof you've died, we will pay the balance of the account to the beneficiary or beneficiaries you designated. Multiple beneficiaries will be paid in equal shares unless the signature card provides otherwise. We do not offer POD accounts in all states.

## iv. "In trust for" (informal trust) account

If you establish your account as in trust for ("ITF") or as trustee for one or more beneficiaries without presenting formal trust documents, we may treat the account as an "ITF" account. If we receive proof you've died, we will pay the balance of the account to the beneficiary or beneficiaries you designated. Multiple beneficiaries will be paid in equal shares unless the signature card provides otherwise. We do not offer ITF accounts in all states.

## v. Convenience account

If you have a convenience account, you are its sole owner, but you authorize an additional signer to write checks or authorize other items. You are solely responsible for the actions of the additional signer (grandfathered accounts only).

## vi. Power of attorney

A power of attorney is a document you sign that authorizes someone else, called the agent, to act on your behalf. If you sign a power of attorney, the agent can sign on your behalf and do anything you could do regarding the account, including withdrawing or spending all of the money in the account. Do not sign a power of attorney unless you trust the agent to act in your best interest. If you choose to add an agent, you must provide a power of attorney form that we agree to accept. We may rely on a copy of an original power of attorney. We are not required to investigate the facts relating to any power of attorney provided to us on your behalf, including whether your signature on the power of attorney is authentic or whether the agent continues to have authority. We may follow or refuse to follow the agent's instructions at any time, including if we suspect fraud or abuse on your account, unless state law requires otherwise. We may also refuse an agent's request to become a joint owner or a beneficiary of an account, but we have no liability to anyone if we do so. We have no liability when we follow or refuse to follow any instructions from an agent, for example, if your agent misuses the authority you have given them.

## vii. Uniform Transfers to Minors Act/Uniform Gifts to Minors Act account

If you're the custodian of an account under a state's Uniform Transfers/ Gifts to Minors Act, you can't pledge it as collateral for a personal loan to you, or cash checks against it.

## viii. Representative payee/VA custodian account

If you open an account as a "representative payee" for someone who receives Social Security payments, or as a legal custodian, spouse payee or other custodian for someone who receives Veterans Administration payments, you agree not to permit any deposits to the account other than the designated payments. We are not required to determine whether you deposit other funds or whether any withdrawals or transfers from the account are for the support of the person for whose

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 10 of 24
Effective 11/11/2018
**CHASE000397**

benefit the funds are paid. This person is called the beneficiary. If the beneficiary dies, you must promptly notify us and stop all further deposits to and withdrawals from the account. If the government demands that we return deposits made after the beneficiary's death and the account does not have enough funds to pay the demand, we may take the funds from any account you or the beneficiary owns.

### ix. Other fiduciary accounts

If you open an estate account, trust account, guardianship or conservatorship account, or other similar type of account, we reserve the right to require any documents we reasonably request to satisfy us that you are authorized to open and use the account, including withdrawing the funds. We do not have to permit any withdrawal from the account until we receive all requested documents. We have no fiduciary duties to you as the trustee, executor, guardian or conservator, or to the beneficial owners of the account.

## 2. Business accounts

If your account is a type listed under "Business Accounts" in our product information, you agree not to use it for personal purposes.

If our records list a business organization as the owner of an account, the account is payable to the business organization and not to any individual director, shareholder, member or partner. "Business organization" means a corporation, unincorporated association, limited liability company, partnership, or any other business, government or non-profit organization. We may rely on the accuracy and completeness of all resolutions, signature cards and other documents you deliver to us in connection with the account. If they state that a person is authorized to sign checks or otherwise initiate transactions on your account, that person is called a signer.

If the account owner is a sole proprietorship, that means that one person conducts the business as his or her own property, instead of through a business organization. A sole proprietor may also designate signers by appropriate documents. We may in some states allow a married couple to open an account as a sole proprietorship.

If you change your form of ownership or authorized signers, you must notify us when the change occurs.

A signer is authorized to endorse checks payable to the business. Endorsements "for deposit" may be written or stamped. A signer is also authorized to sign checks drawn against your account. We are authorized to pay checks without asking how the checks were issued or how the proceeds will be used, even if the check is payable to the person who signed the check.

A signer is authorized to instruct us to close accounts or do anything else involving any account, and to sign any agreements or documents relating to accounts or other business.

We may, although we are not required to, cash checks payable to or accept "less cash" deposits from a business organization.

If you open an attorney trust account, including an IOLTA or similar account, you authorize us to notify the appropriate state agency if the account is overdrawn or checks are dishonored, if the applicable state requires notice of those events.

## 3. Linked accounts

You may link your qualifying accounts to your checking account to help you avoid some fees and get relationship rates. However, deposit accounts opened with Private Bank and Private Wealth Management are not qualifying accounts. An account may be linked to only one checking account.

We may automatically link accounts or we may provide some of the benefits you would be eligible for had you requested your accounts to be linked. If we don't, you may ask us to link your accounts. Your account information may be made available to any other owner on any of the linked accounts. If the checking account to which your other accounts are linked closes for any reason, it is your responsibility to request any remaining eligible accounts to be linked. If we determine your accounts are no longer eligible for linking, we may delink them and we are not required to notify you if we do.

If you choose to link your accounts to other accounts for which you serve as trustee or custodian (fiduciary), your account may receive a financial benefit, which could be a violation of your fiduciary duties. We are not responsible for your decision to link fiduciary accounts. You should carefully consider this decision and consult with your legal advisor if necessary. Refer to your product information to determine which qualifying accounts are eligible to be linked, any additional requirements and the benefits from linking accounts.

## 4. Combined statements

Checking, savings and CD accounts with at least one common owner may be combined on a single statement, either automatically or at your request. If accounts are included on a combined statement and you don't want that, notify us and we'll separate the statements. That change will affect only future statements.

Linked accounts do not have to be on a combined statement to receive the benefits of linking, and combining accounts on a single statement does not mean that the accounts are linked.

Each owner of each account listed on the statement can request a copy of a statement and will be able to view all account activity for all accounts on that statement through chase.com or Chase Mobile.

## G. Interest on Checking and Savings Accounts

When you open a checking or savings account that pays interest, we will provide you a rate sheet stating the current interest rate and Annual Percentage Yield for your account. The rate sheet is considered a part of this agreement.

Your account has a variable interest rate. That means we may change the interest rate and Annual Percentage Yield as often as we choose, without limits and without notice. Interest begins to accrue on the business day we receive credit for your deposit. For cash, wire transfers and electronic direct deposits, interest begins to accrue on the business day of your deposit.

We use the daily balance method for calculating interest. This method applies a daily periodic rate to the balance in your account each day, which may be based on your balance (also called your present or ledger balance) or collected balance as explained in the product information for your account. The collected balance is the balance of all deposits in your account on which we have received credit for the deposited funds (determined by the availability schedule of our Federal Reserve Bank for checks and similar items). We reserve the right not to pay interest on any deposited item that is returned to us unpaid.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 11 of 24
Effective 11/11/2018
**CHASE000398**

Interest is credited and compounded monthly. However, Retirement Money Market accounts with interest distributions will not compound, and interest will be credited on the distribution date. Unless otherwise stated in your product disclosure, interest is computed on a 365-day basis. We pay interest only in whole cents. Therefore, at the end of each interest payment period (usually monthly), any fractional amount of interest less than half of one cent will be rounded down and any fractional amount of interest equal to half of one cent or more will be rounded up to the next whole cent.

## H. Closing Your Account

Either you or we may close your account (other than a CD) at any time for any reason or no reason without prior notice. We are not required to close your account at your request if you have pending transactions, the account is overdrawn or your account is subject to legal process (such as a garnishment, attachment, execution, levy or similar order). In those cases, we will restrict your account against all future withdrawals other than under legal process until pending transactions are paid or returned, the balance is no longer negative, and any legal restriction has been released. After we restrict your account in preparation for closing, we will not pay any additional interest on the account. We may automatically close your account if the balance is $0 or negative. Either you or we may close your CD account on any maturity date without cause.

We may send you written notice that we have closed or will close your account and return the balance less any fees, claims, setoffs or other amounts if the balance is greater than $1. After your account is closed, we have no obligation to accept deposits or pay any outstanding checks, but we may reopen your account if we receive a deposit. We will have no liability for refusing to honor any check drawn on a closed account. We have the right to advise consumer reporting agencies and other third party reporting agencies of accounts closed for misuse, such as overdrafts.

## I. Other Legal Terms

### 1. Telephone and electronic communication

We may record and/or monitor any of our telephone conversations with you. If we do record, we do not have to keep the recordings, unless the law says we must. We may use your voice to verify your identity.

When you give us your mobile number, we have your permission to contact you at that number about all of your Chase or J.P. Morgan  accounts. Your consent allows us to use text messaging, artificial or prerecorded voice messages and automatic dialing technology for informational and account service calls, but not for telemarketing or sales calls. It may include contact from companies working on our behalf to service your accounts. Message and data rates may apply. You may contact us anytime to change these preferences, or change them on chase.com. If you give us your email address, you agree that we may send servicing messages (such as fraud alerts and hold alerts) related to your accounts to that address.

We may send communications electronically, such as by email or text message, rather than through U.S. mail or other means, unless the law says otherwise.

### 2. Adverse claims

If there are conflicting instructions or there is any dispute regarding your account, we may take any action described in the following section or we may place funds in a court (this is called an interpleader action) for resolution. If any person notifies us of a dispute, we do not have to decide if the dispute has merit before we take further action. We may take these actions without any liability and without advance notice, unless the law says otherwise.

### 3. Restricting your account; blocking or delaying transactions

There are many reasons we may decline or prevent transactions to or from your account, but we generally do it to protect you or us, or to comply with legal requirements. We may decline or prevent any or all transactions to or from your account. We may refuse, freeze, reverse or delay any specific withdrawal, payment or transfer of funds to or from your account, or we may remove funds from your account to hold them pending investigation, including in one or more of the following circumstances:

- Your account is involved in any legal or administrative proceeding;
- We receive conflicting information or instructions regarding account ownership, control or activity;
- We suspect that you may be the victim of a fraud, scam or financial exploitation, even though you have authorized the transaction(s);
- We suspect that any transaction may involve illegal activity or may be fraudulent;
- We are complying in our sole judgment, with any federal, state or local law, rule or regulation, including federal asset control and sanction rules and anti-money-laundering rules, or with our policies adopted to assure that we comply with those laws, rules or regulations; or
- We reasonably believe that doing so is necessary to avoid a loss or reduce risk to us.

We also may limit cash deposits to, or withdrawals from, your account (or all of your accounts collectively) in a single transaction or total withdrawals or deposits during any period of time, or who may make deposits, in order to reduce risk and/or enhance our efforts to comply with applicable law.

We will have no liability for any action we take under this section.

### 4. No waiver

If we fail to exercise any right, that doesn't mean that we waive that right or any other right, and we may still enforce all of our rights in the future.

### 5. Changes to the agreement

We may change the terms of this agreement, including fees and features of your account, at any time. If any change would adversely affect you, we will notify you in advance, unless the change is necessary to comply with a legal requirement.

For CDs, changes that would adversely affect you will be effective on the next maturity date.

If we transfer your account to a different business unit within the bank, we may give notice in the same manner and provide you a different deposit agreement to govern your account. You agree that notice of these changes may be provided to any joint owner.

We are not required to send you notice of interest rate and Annual Percentage Yield changes for variable rate accounts or notice of changes in printing fees for documents (such as checks).

We may direct you to a branch or chase.com for the content of any changes or the revised agreement unless the law requires a different method. By maintaining your account after the effective date of any change, you agree to the change.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 12 of 24
Effective 11/11/2018
**CHASE000399**

## 6. Rules governing your account

This agreement, all accounts and services provided to you, and any dispute relating to those accounts and services are governed by federal law and, when not superseded by federal law, the law of the state where your account is located.

Here's how we determine where your account is located:

- If you applied for the account in person at one of our banking offices, then the account is located in the state where you applied.
- If you applied in person for a business account with one of our representatives somewhere other than at one of our banking offices (your place of business, for example), your account is located in the state where the representative's business office is located.
- If you applied for the account by mail, digitally, or through other remote means, **and** your address as recorded in our records was in a state where we had a branch at the time, then the account is located in that state, which for joint accounts will be based on the address of the owner whose name was listed first.
- In all other cases your account will be governed by Ohio law.

Business trust accounts for professionals regulated by a state (or a self-regulatory body under a state's laws) are located in the designated state.

Any provision of this agreement that limits the bank's liability does not negate the bank's duty (if any) under applicable law to act in good faith and with reasonable care. If any provision of this agreement is determined to limit the bank's liability in a way prohibited by applicable law, the provision will nevertheless be enforced to the fullest extent permitted under that law.

Transactions in your account are also subject to applicable clearinghouse and Federal Reserve rules and regulations. You will not provide your account number to accept a payment on behalf of anyone who is not a U.S. citizen or resident using The Clearing House Association's real time payment network. We will not be liable for anything we do when following your instructions. In addition, we will not be liable if we don't follow your instructions if we reasonably believe that your instructions would expose us to potential loss or civil or criminal liability, or conflict with customary banking practices. **WE WILL NOT BE LIABLE FOR INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGES REGARDLESS OF THE FORM OF ACTION AND EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF WE FAIL TO STOP PAYMENT ON AN ITEM, OR PAY AN ITEM BEARING AN UNAUTHORIZED SIGNATURE, FORGED SIGNATURE, OR FORGED ENDORSEMENT OR ALTERATION, OUR LIABILITY, IF ANY, WILL BE LIMITED TO THE FACE AMOUNT OF THE ITEM.**

If this agreement conflicts with any statements made by one of our employees or by our affiliates' employees, this agreement will govern.

## 7. Sub-accounts

For accounting purposes, all checking accounts consist of two sub-accounts: 1) a transaction sub-account where all deposits, withdrawals and fees are posted, and 2) a savings holding sub-account, where available balances above a certain level are transferred daily. Funds will be retransferred to your transaction sub-account to meet your transactional needs; however, all balances in the holding sub-account will be transferred to the transaction sub-account with the sixth transfer in any calendar month or monthly statement period.

Both sub-accounts are treated as a single account for purposes of your deposits and withdrawals, earning interest, access and information, tax reporting, fees, etc.

## 8. Research, legal process and requests for information

If we receive any legal process relating to you or your account, you authorize us to comply with it. "Legal process" means any document that appears to have the force of law that requires us to hold or pay out funds from your account, including a garnishment, attachment, execution, levy or similar order. We do not have to determine whether the legal process was validly issued or enforceable. If a hold is in effect, we will continue to charge any applicable fees even though the account cannot be closed. We also may remove your Overdraft Protection if a hold is placed, but you may ask us to relink your accounts after the hold is removed. As permitted by law, we will deduct from your balance a Legal Processing Fee or costs and expenses we incur in complying with the order, or both.

If any action, including administrative proceedings, garnishment, tax levies, restraining orders or another action is brought against you or your account, you will be liable to us for any loss, cost or expense (including attorneys' fees) resulting from our compliance with any legal process.

If we receive any subpoena, court order or request for information or documents from a government entity or arbitration panel relating to your account, we are authorized to comply with it. If we are required to answer a subpoena or similar order requesting records of your account, we may charge you a Research Fee, less any amount we are paid by the person issuing the subpoena before we deliver our response.

## 9. Permitted time for filing a lawsuit

You must file any lawsuit or arbitration against us within two years after the cause of action arises, unless federal or state law or an applicable agreement provides for a shorter time. This limit is in addition to limits on notice as a condition to making a claim. If applicable state law does not permit contractual shortening of the time during which a lawsuit must be filed to a period as short as two years, you and we agree to the shortest permitted time under that state's laws.

We abide by federal and applicable state record retention laws and may dispose of any records that we retained or preserved for the period set forth in these laws. Any action against us must be brought within the period that the law requires us to preserve records, unless applicable law or this agreement provides a shorter limitation period. Any action against us on an automatically renewable CD must be brought within the time that the law requires us to preserve records based on the stated maturity date in the most recent record of the CD.

## 10. Location of legal proceedings

If you file any lawsuit or other legal proceeding against us that's connected in any way to your accounts or services, you agree to do so in an appropriate court in the state where your account is located. If we file any lawsuit or legal proceeding that is connected in any way to your accounts or services, you consent to jurisdiction and venue in an appropriate court in the state where your account is located. If either party chooses to have disputes resolved by arbitration, the section *Arbitration* governs the process and location of the arbitration proceedings.

## 11. Pre-judgment interest rate

If either you or we are awarded a judgment against the other in connection with your account, the rate of interest earned before judgment on the judgment amount will be the rate of interest the account earned during that period unless state law requires a different rate. If the account is not interest-bearing, the rate will be the lowest generally available rate for a personal interest-bearing checking account.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 13 of 24
Effective 11/11/2018
**CHASE000400**

## 12. Arbitration

You and we agree that upon the election of either of us, any dispute relating in any way to your account or transactions will be resolved by binding arbitration as discussed below, and not through litigation in any court (except for matters in small claims court).

This arbitration agreement is entered into pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA").

YOU HAVE A RIGHT TO OPT OUT OF THIS AGREEMENT TO ARBITRATE, AS DISCUSSED BELOW. UNLESS YOU OPT OUT OF ARBITRATION, YOU AND WE ARE WAIVING THE RIGHT TO HAVE OUR DISPUTE HEARD BEFORE A JUDGE OR JURY, OR OTHERWISE TO BE DECIDED BY A COURT OR GOVERNMENT TRIBUNAL. YOU AND WE ALSO WAIVE ANY ABILITY TO ASSERT OR PARTICIPATE IN A CLASS OR REPRESENTATIVE BASIS IN COURT OR IN ARBITRATION. ALL DISPUTES, EXCEPT AS STATED BELOW, MUST BE RESOLVED BY BINDING ARBITRATION WHEN EITHER YOU OR WE REQUEST IT.

### What claims or disputes are subject to arbitration?

Claims or disputes between you and us about your deposit account, transactions involving your deposit account, safe deposit box, and any related service with us are subject to arbitration. Any claims or disputes arising from or relating to this agreement, any prior account agreement between us, or the advertising, the application for, or the approval or establishment of your account are also included. Claims are subject to arbitration, regardless of what theory they are based on or whether they seek legal or equitable remedies. Arbitration applies to any and all such claims or disputes, whether they arose in the past, may currently exist or may arise in the future. All such claims or disputes are referred to in this section as "Claims."

The only exception to arbitration of Claims is that both you and we have the right to pursue a Claim in a small claims court instead of arbitration, if the Claim is in that court's jurisdiction and proceeds on an individual basis.

### Can I (customer) cancel or opt out of this agreement to arbitrate?

You have the right to opt out of this agreement to arbitrate if you tell us within 60 days of opening your account. If you want to opt out, call us at 1-800-935-9935 or see a banker. Otherwise this agreement to arbitrate will apply without limitation, regardless of whether 1) your account is closed; 2) you pay us in full any outstanding debt you owe; or 3) you file for bankruptcy.

### What about class actions or representative actions?

Claims in arbitration will proceed on an individual basis, on behalf of the named parties only. YOU AND WE AGREE NOT TO:

1. SEEK TO PROCEED ON ANY CLAIM IN ARBITRATION AS A CLASS CLAIM OR CLASS ACTION OR OTHER COMPARABLE REPRESENTATIVE PROCEEDING;

2. SEEK TO CONSOLIDATE IN ARBITRATION ANY CLAIMS INVOLVING SEPARATE CLAIMANTS (EXCEPT FOR CLAIMANTS WHO ARE ON THE SAME ACCOUNT), UNLESS ALL PARTIES AGREE;

3. BE PART OF, OR BE REPRESENTED IN, ANY CLASS ACTION OR OTHER REPRESENTATIVE ACTION BROUGHT BY ANYONE ELSE; NOR

4. SEEK ANY AWARD OR REMEDY IN ARBITRATION AGAINST OR ON BEHALF OF ANYONE WHO IS NOT A NAMED PARTY TO THE ARBITRATION.

If these terms relating to class or representative procedures are legally unenforceable for any reason with respect to a Claim, then this agreement to arbitrate will be inapplicable to that Claim, and the Claim will instead be handled through litigation in court rather than by arbitration. No arbitrator shall have authority to entertain any Claim on behalf of a person who is not a named party, nor shall any arbitrator have authority to make any award for the benefit of, or against, any person who is not a named party.

### Does arbitration apply to Claims involving third parties?

Arbitration applies whenever there is a Claim between you and us. If a third party is also involved in a Claim between you and us, then the Claim will be decided with respect to the third party in arbitration as well, and it must be named as a party in accordance with the rules of procedure governing the arbitration. No award or relief will be granted by the arbitrator except on behalf of, or against, a named party. For purposes of arbitration, "you" includes any person who is listed on your account, and "we" includes JPMorgan Chase Bank, N.A., all its affiliates, and all third parties who are regarded as agents or representatives of ours in connection with a Claim. (If we assign your account to an unaffiliated third party, then "we" includes that third party.) The arbitration may not be consolidated with any other arbitration proceeding.

### How does arbitration work?

The party filing a Claim in arbitration must select either: JAMS or the American Arbitration Association ("AAA") as the arbitration administrator. That organization will apply its code of procedures in effect at the time the arbitration claim is filed. If there is a conflict between that code of procedures and this arbitration provision and/or this agreement, this arbitration provision and this agreement will control. In the event that JAMS or the AAA is unable to handle the Claim for any reason, then the matter shall be arbitrated instead by a neutral arbitrator selected by agreement of the parties (or, if the parties cannot agree, selected by a court in accordance with the FAA), pursuant to the AAA rules of procedure.

The arbitrator will decide the Claim in accordance with all applicable law, including recognized principles of equity and statutes of limitations, and will honor all claims of privilege recognized by law. The arbitrator will have the power to award to a party any damages or other relief provided for under applicable law. A single arbitrator will conduct the arbitration and will use applicable substantive law, including the Uniform Commercial Code, consistent with the FAA and the applicable statutes of limitations or conditions precedent to suit, and will honor claims of privilege recognized at law. The arbitrator can award damages or other relief provided for by law to you or us, but not to anyone else. The arbitrator's authority is limited to the Claims between you and us.

### Is the arbitrator's decision final? Is there an appeal process?

The arbitrator's decision will be final and binding on the parties. A party can file a written appeal to the arbitration administrator within 30 days of award issuance. The appeal must request a new arbitration in front of three neutral arbitrators designated by the same arbitration administrators. The panel will reconsider all factual and legal issues, following the same rules of procedure, and will make decisions based on majority vote. Any final arbitration award will be binding on the named parties and enforceable by any court having jurisdiction.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 14 of 24
Effective 11/11/2018
**CHASE000401**

**Who will pay for costs?**

We will pay any costs that are required to be paid by us under the arbitration administrator's rules of procedure. Even if not otherwise required, we will reimburse you up to $500 for any initial arbitration filing fees you have paid. We will also pay any fees of the arbitrator and arbitration administrator for the first two days of any hearing. If you win the arbitration, we will reimburse you for any fees you paid to the arbitration organization and/or arbitrator. All other fees will be allocated according to the arbitration administrator's rules and applicable law. If you consider that you are unable to afford any fees that would be yours to pay, you may request that we pay or reimburse them, and we will consider your request in good faith.

**How do I (customer) file an arbitration claim?**

Rules and forms may be obtained from, and Claims may be filed with, JAMS (1-800-352-5267 or www.jamsadr.com) or the AAA (1-800-778-7879 or www.adr.org). Arbitration hearings will take place in the federal judicial district that includes your address at the time the Claim is filed, unless the parties agree to a different place.

### 13. Assignment of agreement and successors

This agreement will be binding on your personal representative, executors, administrators and successors, and on our successors and assigns.

You may not assign, transfer or grant a security interest in your account to anyone other than us without our written consent. No assignment will be valid or binding on us, and we won't be considered to have knowledge of it, until we consent and note the assignment in our records. However, by noting the assignment, we do not have any responsibility to assure that the assignment is valid. Any permitted assignment of your account is subject to our setoff rights.

### 14. Authorization to share information

You authorize us to share information about you and your account with affiliates and third parties, unless the law or our Privacy Notice prohibits us from doing so. Please see our *Privacy Notice* for your choices about information sharing.

### 15. Referrals

If you request it, our employees may at times provide contact information about third parties, such as lawyers, accountants, or contractors who offer products or services to the public. Some of these third parties may be our customers. We provide this information only as a courtesy and convenience to you and the third party, but in some cases we may be compensated for a referral. We do not make any warranties or representations about the third parties or their products or services. If you choose to do business with any third party, that decision is yours alone, and we are not responsible for the third party's performance or to help resolve any dispute between you and the third party. Our employees may also receive compensation when you purchase a Chase product based on their referral.

### 16. Illegal activities

We strictly prohibit the use of any account to conduct transactions (including, without limitation, the acceptance or receipt of credit or other receipt of funds through an electronic funds transfer, or by check, draft or similar instrument, or the proceeds of any of the foregoing) that are related, directly or indirectly, to unlawful Internet gambling. The term "unlawful Internet gambling," as used in this Notice, shall have its meaning set forth in 12 C.F.R. Section 233.2(bb). You agree not to conduct any transactions through the account that directly or indirectly involve or are related to unlawful Internet gambling, including, without limitation, the acceptance or receipt of any funds or deposits in connection therewith.

You also agree not to use your account for any other illegal activity. We may refuse any gambling transaction, whether lawful or not.

### 17. Inactive and unclaimed accounts

Each state has laws that govern when accounts are considered inactive or abandoned, and when we're required to send a customer's funds to the state. We encourage you to make sure your accounts remain active by making transactions, signing in to your account online or meeting with a banker. We'll mail you a letter to notify you before we transfer your funds to the state as abandoned property.

### 18. Our responsibility to obtain personal information

Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or business who opens an account. We require the following information or documents as a condition to your opening an account:

- For a personal account: your name; residential address; date of birth; and Social Security number, driver's license or other identifying documents
- For a business account: your business name, taxpayer identification number and business address; the name, residential address, date of birth and Social Security number of each signer, so we can verify the signer's identity; and documents to verify the business's existence.

Our policies may require additional information about you or any person associated with you or with the account when or after you open the account to assure that we comply with "Know Your Customer" requirements. We may restrict or close your account if we are unable to obtain information in order to satisfy our "Know Your Customer" requirements. By opening an account with us, you confirm that neither you nor any beneficial owner of any account is covered by any sanctions programs administered or enforced by the U.S. Department of the Treasury, Office of Foreign Asset Control.

### 19. English language — Other language preferences

The terms of this agreement and the products and services we provide are governed by the English language. As a courtesy, we make some of our forms, disclosures and documents, including this agreement, available in languages other than English. However, many important bank documents, and some products and services related to this account, are provided only in English. If there is any difference in meaning between the English and non-English version of any of our documents, the English version applies and is available upon request.

### 20. Disputing information reported to a consumer reporting agency

If you believe that we have reported inaccurate or incomplete information about your account to a consumer reporting agency, you have the right to file a dispute with that consumer reporting agency. You may also submit a dispute directly to us by writing to the address on the back cover. Provide your name, address and phone number; the account number; the specific information you are disputing; an explanation of why it is inaccurate or incomplete; and any supporting documentation.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 15 of 24
Effective 11/11/2018
**CHASE000402**

## Substitute Checks and Your Rights

**What is a substitute check?**

To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks, with a reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other law with respect to those transactions.

**What are your rights as a consumer regarding substitute checks?**

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, Insufficient Funds Fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest-bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500 of your refund (plus interest if applicable) within 10 business days after we receive your claim and the remainder of your refund (plus interest if applicable) no later than 45 calendar days after we receive your claim. We may reverse the refund (including interest) if we later determine the substitute check was correctly posted.

**How do you make a claim for a refund?**

If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact us. You must contact us within 40 calendar days of the date that we mailed or otherwise delivered the substitute check or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

**Your claim must include:**

- A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);
- An estimate of the amount of your loss;
- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
- The following information to help us identify the substitute check: the check number, the name of the person to whom you wrote the check, and the amount of the check.

## Electronic Funds Transfer Service Terms

We provide a variety of electronic funds transfer (EFT) services for deposit accounts. These include payments, deposits and transfers that you make or receive by electronic methods, such as with your card, telephone, or chase.com.

**A. TYPES OF EFT SERVICES**

**1. ATM and debit cards**

You may obtain an ATM card if you have a checking or savings account or debit card if you have a checking account. If you do not select a PIN when you request your card, we will mail you a randomly generated PIN. We may deactivate any temporary ATM card when you activate your debit card.

You can use your card as follows:

**At ATMs to:**

- Withdraw cash;
- Transfer money;
- Check your balances;
- Deposit cash or checks;*
- Make payments to qualifying Chase credit cards and loans;*
- Obtain a copy of recent account activity.*

Services marked with an asterisk (*) are available only at Chase ATMs, and all services may not be available at all Chase ATMs.

When you use a Chase ATM, you will have access to all of your personal checking, savings, Chase Liquid® and credit card accounts, regardless of whether the accounts are linked to your card. When linking multiple accounts to your card, one checking account and one savings account will be designated as primary. We also offer cards with limited functions for your deposit accounts, such as deposit-only business cards and prepaid cards that can be linked to a checking or savings account. Subject to the limited functions provided for each card, limited-function cards are also considered "cards" under this agreement.

You can use a non-Chase ATM only if it is in a participating network. Your primary checking and savings accounts will be accessible on that network, and your other linked accounts may be accessible. Outside the U.S., only your primary checking account is usually accessible. We may charge a Non-Chase ATM Fee, and the ATM owner or ATM network may also charge a fee. Any of these fees may be charged for any activity, including withdrawals, balance inquiries and transfers. We generally

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 16 of 24
Effective 11/11/2018
**CHASE000403**

waive the Non-Chase ATM Fee for a balance inquiry or transfer if it is made in connection with a withdrawal at the same non-Chase ATM at the same time with the same card. On some accounts, we will refund ATM fees charged by the ATM owner; however, some ATM owners do not identify these fees in the information they send to us and, as a result, we may not automatically refund the fee. If for any reason the refund is not processed, please contact us.

**You can use your debit card (but not your ATM card):**

**At participating merchants to:**

- Purchase goods and services. Purchases are subtracted from your primary checking account. If you have arranged with your merchant to make recurring payments, you must notify the merchant if your card number or expiration date has changed or your debit card is closed. We may also provide the merchant or the participating network your new account number and expiration date.
- Withdraw cash while making a purchase using your PIN if the merchant permits the cash-back option.
- Send or receive payments from another person, or receive payments from a business by providing your Card number to third-party payment services.

**At participating financial institutions to:**

- Withdraw funds at a teller. Withdrawals are subtracted from your primary checking account. You will be charged a Non-ATM Cash Fee.

## 2. Electronic transfers using your account number

You may authorize a third party to transfer funds to or from your account by providing your account number and your routing number. These transfers may use various payment networks and may take various forms, such as:

- Employer payroll, government benefits or other direct deposits;
- One-time or recurring charges to your account to a utility payment or to pay other bills; or
- A "check conversion" transfer, where a merchant or other payee creates an electronic transfer from your paper check. The merchant may keep your check or return it to you.

## 3. Online banking and Chase Mobile

You may use chase.com or Chase Mobile to view your account information, make deposits (Chase Mobile only), transfer funds between your Chase accounts, pay qualifying Chase loans or credit cards, or make payments from your account to third parties. Enroll for these services on chase.com or by downloading the Chase Mobile app for select mobile devices. You must agree to the additional disclosures and specific terms for using these services when you enroll.

## 4. Telephone banking

You may use our automated customer service system or speak to a telephone banker to get your account information, transfer funds between your accounts with us, or pay qualifying Chase loans or credit cards. You must have a valid deposit or loan account and a valid password or PIN to use the automated system. Business account holders may also use a valid Taxpayer Identification Number (TIN).

## 5. Overdraft Protection transfers

Transfers to and from your accounts for Overdraft Protection are also EFTs and subject to these terms.

## B. IMPORTANT INFORMATION AND AGREEMENTS ABOUT YOUR CARD

### 1. Authorizations and holds

Most merchants ask us to authorize your purchase. When we give authorization to a merchant, we will reserve or place a hold on your balance, generally for three business days, to pay for your purchase. We may authorize or refuse to authorize a transaction based on a different amount than the authorization request, because some merchants request authorization for an amount that is unrelated to the actual amount of the purchase (such as self-service fuel).

For some types of purchases we may place a hold for a longer period. There are times—for example, at restaurants, hotels or car rental agencies—that merchants won't know the exact amount of your purchase when they request the authorization. If the authorization is more or less than your actual purchase amount, the hold may remain for a day or two even after your purchase amount has been subtracted from your balance. We will pay the purchase amount from your balance whenever the merchant sends it to us, even if the hold has expired.

### 2. Overdrafts

For personal accounts, unless you have notified us that you DO want us to pay debit card overdrafts at our discretion, we generally won't authorize an everyday debit card transaction if your available balance isn't enough to pay that transaction, and we will not charge an Insufficient Funds Fee. For business accounts, if you have notified us NOT to pay overdrafts we generally won't authorize a debit card transaction if your available balance isn't enough to pay that transaction, and we will not charge an Insufficient Funds Fee. If any other transaction overdraws your account, we will assess fees described in the *General Account Terms* and the Fee Schedule.

### 3. Canceling your card

We may cancel your card at any time without notice. You may cancel your card by calling us. If you do, please destroy it.

### 4. Our right to refuse transactions

We can refuse to authorize any transaction when your card has been reported lost or stolen or when we reasonably believe there may be fraudulent, suspicious or illegal activity. If you lock your card, we will stop authorizing everyday debit card transactions and ATM withdrawals but may still authorize recurring debit card transactions. Any card we issue to you will be unlocked when you activate it.

### 5. Foreign exchange transactions

The exchange rate applied to card transactions that occur in a different currency will be selected by the network that processes the transaction. The network will select from the range of rates available in wholesale currency markets or a rate mandated by the government that issues or controls the currency in that country on the date it processes the transaction. The processing date on which the exchange rate is applied may differ from the date you used your card. We will charge a Foreign Exchange Rate Adjustment Fee on the card transaction amount after conversion to U.S. dollars.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 17 of 24
Effective 11/11/2018
**CHASE000404**

The exchange rate we use may include a spread, commissions or other costs that we, our affiliates or vendors charge in providing foreign exchange to you. The exchange rate may vary among customers depending on your relationship, products with us, or the type of transaction being conducted, the dollar amount, type of currency, and the date and the time of the exchange. You should expect that these rates will be less favorable than rates quoted online or in publications.

## 6. Debit or credit prompts at terminals

If a merchant asks "Debit or Credit?" when you make a purchase, you can choose either one and your purchase will be subtracted from your primary checking account.

- If you select Debit, you must also enter your PIN.
- If you select Credit, you may have to provide a signature except for some smaller amounts and when paying for self-service fuel.

## 7. ATM safety and safeguarding your account information

**Be safe at ATMs.** We advise you to be aware of your surroundings before, during and after any ATM use. Here are some additional tips:

- Choose an ATM that is well lit.
- Don't use an ATM that looks unusual or altered. If you suspect the ATM isn't working properly, cancel the transaction and find another machine.
- At a walk-up ATM, minimize transaction time by having your card ready to use. At a drive-up ATM, keep your car engine running and lock your doors.
- Stand between the ATM and anyone waiting to use the machine or cover your hand so others can't see your PIN or the transaction amount.
- As soon as your transaction is complete, remove your card from the ATM, and then put away your money, receipt, and card.
- Contact the police or a security officer if you see any suspicious activity at the ATM. If you think you're being followed, go to a busy area and immediately contact the police.

**Keep your PIN confidential.** Never give your PIN to anyone, and don't write it down. In addition, to keep your card information safe:

- Use a PIN that others can't easily figure out.
- To change your PIN (or if you forget your PIN), request a new PIN at chase.com, call us or visit any Chase branch.

**Protect your debit card or ATM card as you would a credit card or cash.**

**Notify us immediately if your card is lost or stolen,** or if you discover any other error. The sooner you report a problem, the sooner we can take precautions to ensure your card isn't misused.

## C. LIMITATIONS ON TRANSFERS, AMOUNTS, AND FREQUENCY OF TRANSACTIONS

To protect your balance, we place daily dollar limits on ATM withdrawals and card purchases, even if your available balance is higher than the daily limit. Your limits are contained in the product information you received when you opened your account.

However, we may:

- Allow transactions that exceed your limits.
- Temporarily reduce your limits without notice, for security purposes.
- Change your limits (we'll notify you if we do).

You are allowed a limited number of withdrawals from your savings account. See Limits on savings account withdrawals for details.

Your card will be restricted if we consider your account to be inactive or dormant.

## D. RECEIPTS AND STATEMENTS

You will receive or have the option to receive a receipt at ATMs, teller stations and merchant locations each time you make a transaction. However, for certain small dollar transactions at merchant locations, you may not receive a receipt.

See *Statements and notices* for information about periodic statements.

To confirm that you have received a direct deposit, review your balance and recent transactions through chase.com, Chase Mobile, at an ATM, or call us.

## E. IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS

If you think your statement is wrong, or if you need more information about a transaction listed on it, call or write us at the telephone number or address at the end of this agreement.

**For personal accounts only, the following procedures apply:**

We must hear from you NO LATER than 60 days after we sent you the FIRST statement on which the error appeared. Please provide us with the following:

- Your name and account number;
- A description of the error or the transaction you are unsure about, and why you think it is an error or want more information; and
- The amount of the suspected error.

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. However, if we need more time, we may take up to 45 days to investigate your complaint or question. If we do this, we will credit your balance within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If you opened your account less than 30 days before the date of the suspected error, the 10-business-day period is extended to 20 business days. If you opened your account less than 30 days before the date of the suspected error or the transaction occurred at a point-of-sale location or outside the U.S., the 45-day period is extended to 90 days.

If you call us, we may require that you send us your complaint or question in writing within 10 business days. If we do not receive it within 10 business days, we may not credit your balance.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 18 of 24
Effective 11/11/2018
**CHASE000405**

We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**For business accounts,** our practice is to follow the procedures described above, but we are not legally required to do so. For example, we are not required to process a claim if you don't notify us within 30 days after we send or make available a statement showing the transaction, to give provisional credit, or to finalize the claim during the periods stated above.

## F. OUR LIABILITY FOR FAILURE TO COMPLETE TRANSACTIONS

If we do not complete a transaction from your personal account on time or in the correct amount, we will be liable for your losses or damages. However, we are not liable for any failed transaction if you do not have enough money in your balance to cover a transaction, if the ATM or device does not have enough cash or is not working properly, if circumstances beyond our control prevent the transaction, if the merchant requests authorization for an amount greater than the purchase amount, or if there are other exceptions stated in this agreement or as provided by law. We are not liable for failure to complete a transaction on a business account if we send you notice that the transaction was not completed.

## G. PREAUTHORIZED (RECURRING) TRANSFERS AND STOP PAYMENTS

You may use your account or debit card to make recurring payments. If these recurring payments vary in amount, the payee will tell you the amount and date of the next payment at least 10 days before the payment due date. You may choose to get this notice from your payee only when the payment would differ by more than a certain amount from the previous payment or when the amount would fall outside certain limits that you set.

You can stop some payments before the scheduled payment date in the following ways:

1. If you provided your card number for the recurring transfer, you must contact us by telephone or at the branch and give us the exact card number. We will close the card and you can replace it upon request.

2. If you provided your account number and routing number for ACH direct debits to your account (both recurring and one-time payments), you must contact us by telephone or at the branch and give us your account number and the exact name of the payee. We will also need the exact amount of the payment, a range of amounts or an instruction to block all payments from the named payee. We will charge a Stop Payment Fee. We may refuse a payment to a payee with a similar name that we believe to be the same payee; however, we are not liable if we don't refuse the payment. If you see a "pending" payment for a different amount or for a different payee than the stop payment you placed, contact us before the end of the business day so we can try to refuse payment.

Your stop payment is effective until we have determined that the ACH transaction is no longer occurring, or for 18 months, whichever is longer.

For business accounts, your ACH stop payment will either be effective:

• Until we have determined that the ACH transaction is no longer occurring, or for 18 months, whichever is longer, or

• One calendar year with automatic renewal annually for up to six additional years. We will list scheduled renewals on your business account statement 60 to 90 days in advance. The stop payment will be renewed, and you will be charged a Stop Payment Automatic Renewal Fee, unless you notify us not to renew by following the instructions in the statement.

3. If you set up your recurring or one-time bill payments or transfers through chase.com or Chase Mobile, you can use that service to cancel pending and future payments.

4. If you previously set up recurring account transfers in the branch, you can only cancel those pending and future transfers in the branch.

We will generally process a stop payment request as soon as we receive it. If you place a stop payment three or more business days before the transfer is scheduled, and we still pay, we will be responsible for your losses or damages.

## H. DISCLOSURE OF ACCOUNT INFORMATION TO THIRD PARTIES

Information about your account or the transactions you made will be disclosed to third parties:

• As necessary to complete transactions;

• In connection with the investigation of any claim you initiate;

• To comply with government agency, arbitration or court orders;

• With your written permission;

• As permitted by our Privacy Notice.

## I. NOTICE OF YOUR RIGHTS AND LIABILITIES

**For personal accounts only:**

Tell us AT ONCE if you believe your card, PIN or code has been lost or stolen. Calling us is the best and fastest way of keeping your possible losses to a minimum.

If you tell us within two business days, you can lose no more than $50 if someone used your card, PIN or code without your permission. If you do NOT tell us within two business days after you learn of the loss or theft of your card, PIN or code and we can prove we could have stopped unauthorized transactions if you had told us, you could lose as much as $500. If your statement shows electronic funds transfers that you did not make, tell us right away. If you do not tell us within 60 days after the statement was sent or otherwise made available to you, you may not get back any money you lost after the 60 days if we can prove that we could have prevented the transactions if you had told us in time.

If a good reason (such as a long trip or a hospital stay) kept you from telling us, let us know. We will extend the time periods.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 19 of 24
Effective 11/11/2018
**CHASE000406**

**For business accounts only, you agree:**

1. To assist us in the investigation of claims for unauthorized transactions and related prosecution by completing the appropriate statements and reports reasonably requested by us;

2. To notify us promptly in writing if any user of a card is no longer employed by you or authorized to conduct business on your behalf;

3. That by allowing anyone to use your card, or by failing to exercise ordinary care (such as storing your PIN with your card or selecting your birthday as your PIN), you will be responsible for all authorized and unauthorized transactions;

4. That all of the provisions of the Deposit Account Agreement, including liability limitations and the requirement that you give us notice of unauthorized items within 30 days, apply to your EFT services.

**Special Provisions for Card Transactions (Zero Liability Protection) for personal and business accounts:**

You are not liable for any unauthorized transactions, including transactions made at merchants, over the telephone, at ATMs or on the Internet, if you notify us promptly.

However, these special provisions do not apply where you were grossly negligent or fraudulent in the handling of your account or card, where you have given someone else your card, card number or PIN, or where you delay reporting unauthorized transactions for more than 60 days (30 days for business accounts).

**J. FEES**

Fees for all EFT services are disclosed in our Fee Schedule and product information.

**K. SERVICES NOT COVERED BY THIS PART; SEPARATE AGREEMENTS**

For personal accounts, EFT services described in the *Electronic Funds Transfer Service Terms* do not include wire transfers and any transactions that are not covered by Consumer Financial Protection Bureau Regulation E.

For business accounts, wire transfers and other services not specifically described in this disclosure are governed by the *General Account Terms* or by separate agreements.

We may offer additional EFT services besides those described in the *Electronic Funds Transfer Service Terms* that have separate agreements and disclosures.

# Account Alerts and Text Banking

If you receive or otherwise use Account Alerts or text banking, you agree to the following terms. If you are enrolled with chase.com, the terms of the Online Service Agreement control the terms of these services instead.

- We may use a telephone number, email address or other delivery point we have in our records for you or other contact information that you provide to us for these services so we can send you certain information about your account. You may be automatically enrolled to receive certain Account Alerts via email. To manage your Alerts preferences or cancel Account Alerts, use chase.com or Chase Mobile or speak to a Telephone Banker.
- We will send Account Alerts or text banking messages through your service provider, who will act as your agent and deliver them to you. Delivery of alerts may be delayed for various reasons, including service outages affecting your phone, wireless, or Internet provider; technology failures; and system capacity limitations.
- We do not charge for Account Alerts or text banking, but message and data rates may apply. **To cancel text banking services, send STOP to 24273 at any time.** For help or information on text banking, send HELP to 24273 or contact us at 1-877-242-7372.
- Account Alerts and text banking are provided for your convenience and do not replace your monthly statement, which is the official record of your account. Anytime you review your balance, keep in mind it may not reflect all transactions, including recent debit card transactions or checks you have written.
- You understand we may not encrypt information when it is sent to you through these services. This information may include personal or confidential information about you, such as account activity or the status of your account.

You understand we are not liable for losses or damages from any disclosure of account information to third parties, non-delivery, delayed delivery, misdirected delivery or mishandling of, or inaccurate content in Account Alerts or information sent through text banking. If we suffer a loss, cost or expense because you provide an incorrect telephone number, email address or other delivery point, or you violate applicable laws, you have to pay that amount to us.

# Funds Availability Policy

**For all accounts other than Chase Analysis Business Checking (with or without Interest):** Wire transfers, electronic direct deposits and cash deposits will be available on the day we receive your deposit. Except as described later in this policy, when you make other deposits, the funds are available on the first business day after the day we receive your deposit.

In most cases when you deposit checks drawn on a Chase account:

- At a teller station, funds from these deposits made with an employee will be available on the same day we receive your deposit;
- At an ATM, some or all funds from these deposits will be available on the same day we receive your deposit.

Once funds are available, you may withdraw them or use them to pay checks and other items.

**For Chase Analysis Business Checking (with or without Interest):**

**Same-day availability:** Wire transfers, electronic direct deposits, and cash deposits made with a banker or at an ATM will be available on the day we receive your deposit.

**Next business day availability:** Funds from the following deposits are available on the first business day after the day we receive your deposit:

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 20 of 24
Effective 11/11/2018
**CHASE000407**

- U.S. Treasury checks that are payable to you;
- Checks that are drawn on us.
- The following items, if you make the deposit in person to one of our employees:
    a. State and local government checks that are payable to you, if you use the "Next Day Funds Availability" deposit slip available at any branch upon request;
    b. Cashier's, certified, and teller's checks that are payable to you, if you use the "Next Day Funds Availability" deposit slip available at any branch upon request;
    c. Federal Reserve Bank checks, Federal Home Loan Bank checks, and postal money orders that are payable to you.

**Second business day availability:** Funds from all other deposits are available no later than the second business day after the day we receive your deposit. Available funds may be withdrawn in cash or used to pay checks and other items.

**When Your Deposit Is Received:**
If you make a deposit with a teller at one of our branches on a business day, we will consider that day to be the day of your deposit. If you make a deposit on a business day before our cutoff time at a Chase ATM, we will consider that day to be the day of your deposit. However, if you make a deposit on a day that is not a business day, or make an ATM deposit after the ATM cutoff time, we will consider the deposit to have been made on the next business day.

- For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays and federal holidays.
- For deposits and transfers at most ATMs, the cutoff time is 11 p.m. Eastern Time (8 p.m. Pacific Time). For ATMs with an earlier cutoff, the ATM screen will notify you of the cutoff time.
- Deposits placed in a night depository are considered received when we remove them from the night depository; we will remove deposits no later than the next business day.
- Branches in some locations may be closed on business days in observance of a state holiday or because of an emergency, and deposits made at a night depository when those branches are closed will be considered received on the next business day when the branch is open.
- We will not accept cash deposits by mail. Check deposits made by mail should be addressed to:

National Bank By Mail
PO Box 36520
Louisville, KY 40233-6520

All deposits made by mail and addressed to any other Chase facility may be forwarded to the National Bank By Mail facility in Louisville, Kentucky, and will be considered received on the date the deposit is received by that facility.

**Longer Delays May Apply:**
**For all accounts other than Chase Analysis Business Checking (with or without Interest):** In some cases, we may not make all of the funds that you deposited by check available by the first business day after the day of your deposit. Funds may not be available until the second business day after the day of your deposit. However, at least the first $200 of these deposits will be available on the first business day after the day of your deposit. If you will need the funds from a deposit right away, you should ask us when the funds will be available, but further review of the deposit after we receive it may still result in delayed availability.

**For all accounts:** Funds you deposited by check may be delayed for longer than two business days under the following circumstances:

- We believe a check you deposited will not be paid;
- You deposited checks totaling more than $5,000 in any one day;
- You redeposited a check that has been returned unpaid;
- You have overdrawn your account repeatedly in the last six months; or
- There is an emergency, such as failure of communications or our systems.

If we delay availability for one of these reasons, funds may not be available until the seventh business day after the day of your deposit.

If your check deposit is made with one of our employees or at an ATM and we decide at that time to delay your ability to withdraw funds, we will tell you then. If we decide to delay availability of your funds after you complete your deposit, we will mail you a deposit hold notice by the business day after we decide to take that action.

**Special Rules for CDs and Retirement Money Market Accounts:**
Generally, funds you deposit will be available within one business day except when you deposit checks that total more than $5,000 in a business day. The amount exceeding $5,000 will be available no later than the seventh business day after the day of your deposit. However, we are not required to let you withdraw principal from a CD before it matures.

**Special Rules for New Accounts:**
If you are a new customer, the following special rules may apply during the first 30 days your account is open:

- Funds from deposits of the first $5,000 of a business day's total deposits of cashier's, certified, teller's, traveler's, and federal, state, and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you. The excess over $5,000 will be available on the seventh business day after the day of your deposit. If your deposit of these checks (other than U.S. Treasury checks) is not made in person to one of our employees, the first $5,000 will not be available until the second business day after the day of your deposit; and
- Funds from all other check deposits will be available no later than the seventh business day after the day of your deposit.

**Holds on Other Funds:**
If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available on the day they would have been available if you had deposited the check.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 21 of 24
Effective 11/11/2018
**CHASE000408**

*Privacy Notice*

## CHASE ⬤

Rev. October 2014

| FACTS | WHAT DOES CHASE DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>■ Social Security number and income<br>■ account balances and transaction history<br>■ credit history and payment history |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Chase chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Chase share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes** – such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes** – to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes** – information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes** – information about your creditworthiness | Yes | Yes |
| **For our affiliates to market to you** | Yes | Yes |
| **For nonaffiliates to market to you** | Yes | Yes |

| To limit our sharing | ■ Call 1-888-868-8618 - our menu will prompt you through your choice(s). For operator relay assistance, first dial 711.<br>■ Chase Sapphire® customers please call 1-800-493-3319.<br>■ **Visit us online: chase.com/privacypreferences.**<br><br>**Please note:**<br>If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. When you are *no longer* our customer, we continue to share your information as described in this notice.<br><br>However, you can contact us at any time to limit our sharing. |
|---|---|

| Questions? | ■ Call 1-888-868-8618 - our menu will prompt you through your choice(s). For operator relay assistance, first dial 711.<br>■ Chase Sapphire® customers please call 1-800-493-3319. |
|---|---|

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 22 of 24
Effective 11/11/2018
**CHASE000409**

**Page 2**

## Who we are

| Who is providing this notice? | The JPMorgan Chase & Co. family of companies. A partial list of its U.S. consumer financial companies is located at the end of this document. |
|---|---|

## What we do

| How does Chase protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. We authorize our employees to get your information only when they need it to do their work, and we require companies that work for us to protect your information. |
|---|---|
| How does Chase collect my personal information? | We collect your personal information, for example, when you<br>■ open an account or make deposits or withdrawals from your account<br>■ pay your bills or apply for a loan<br>■ use your credit or debit card<br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>■ sharing for affiliates' everyday business purposes – information about your creditworthiness<br>■ affiliates from using your information to market to you<br>■ sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on your account. |

## Definitions

| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>■ *Our affiliates include companies with a Chase or J.P. Morgan name and financial companies such as J.P. Morgan Securities LLC* |
|---|---|
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>■ *Nonaffiliates we share with can include companies such as retailers, auto dealers, auto makers and membership clubs* |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>■ *Our joint marketing partners include categories of companies such as insurance companies* |

## Other important information

**State laws:**

VT: Accounts with a Vermont mailing address are automatically treated as if they have limited the sharing as described on page 1. For joint marketing, we will only disclose your name, contact information and information about your transactions.

NV: We are providing you this notice pursuant to Nevada law. If you prefer not to receive marketing calls from us, you may be placed on our Internal Do Not Call List by calling 1-800-945-9470, Chase Sapphire® customers please call 1-800-493-3319, or by writing to us at P.O. Box 659752, San Antonio, TX 78265-9752.

For more information, contact us at the address above, or email Privacy.Info@JPMChase.com, with "Nevada Annual Notice" in the subject line. You may also contact the Nevada Attorney General's office: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; telephone number: 1-702-486-3132; email BCPINFO@ag.state.nv.us

CA: Accounts with a California mailing address are automatically treated as if they have limited the sharing with nonaffiliates as described on page 1. CA residents are provided a CA notice for additional choices.

**Who is providing this notice?**

JPMorgan Chase Bank, N.A.          Chase Insurance Agency, Inc.          Chase Bankcard Services, Inc.
J.P. Morgan Securities LLC         Chase Bank USA, N.A.

Separate policies may apply to customers of certain businesses, such as J.P. Morgan Private Bank.

## *How to Contact Us:*

**Personal Accounts:**

| | |
|---|---|
| Main phone number: | 1-800-935-9935 |
| Spanish: | 1-877-312-4273 |
| International calls: | 1-713-262-1679 |
| Website: | chase.com |

**Business Accounts:**

| | |
|---|---|
| Main phone number: | 1-800-242-7338 |
| Spanish: | 1-888-622-4273 |
| International calls: | 1-713-262-1679 |
| Website: | chase.com/business |

**Chase Private Client:**

| | |
|---|---|
| Main phone number: | 1-888-994-5626 |
| International calls: | 1-405-235-4847 |
| Website: | chase.com/privateclient |

**Chase Mobile or Online Banking:**    1-877-242-7372

**Deaf and Hard of Hearing:**

Operator Relay calls:

| | |
|---|---|
| Personal Accounts: | 1-800-935-9935 |
| Business Accounts: | 1-800-242-7338 |
| Direct TTY calls: | 1-800-CHASETD (1-800-242-7383) |

**Electronic Funds Transfers (EFTs):**

In case of errors or questions about your EFTs, or if you believe your debit card has been lost or stolen, call us at 1-866-564-2262 or write:

Chase
PO Box 659809
Internal Mail TX3-7849
San Antonio, TX 78265-9109

**To Dispute Information Reported to a Consumer Reporting Agency:**

JPMorgan Chase Bank, N.A.
PO Box 182108
Internal Mail OHW-1000
Columbus, OH 43218

**All Other Written Correspondence:**

JPMorgan Chase Bank, N.A.
PO Box 659754
San Antonio, TX 78265-9754



CHASE PRIVATE CLIENT



DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2018 JPMorgan Chase & Co.

Page 24 of 24
Effective 11/11/2018
**CHASE000411**

# EXHIBIT 17

```
 1                UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF ARIZONA

 3
                                      )
 4    Bruce E. Huffman,               )
                                      )
 5         Plaintiff,                 )
                                      )   Case No.
 6    v.                              )   2:22-cv-00903-JJT
                                      )
 7    JPMorgan Chase Bank, N.A.;      )
      Goodman Holmgren Law Group, LLP;)
 8    and Magic Ranch Estates         )
      Homeowners' Association,        )
 9                                    )
           Defendants.                )
10    _____)

11

12

13

14        VIDEOTAPED DEPOSITION OF BRUCE EVERETT HUFFMAN

15

16                     Phoenix, Arizona

17                     October 27, 2023

18

19

20

21

22

23    Prepared by:

24    Meri Coash, RMR, CRR
      Certified Reporter
25    Certification No. 50327
```

**CERTIFIED TRANSCRIPT**

| | | |
|---|---|---|
| 09:22:24 | 1 | practicing law, period.  I . . . |
| 09:22:27 | 2 | Q.   And when did you move to Arizona? |
| 09:22:34 | 3 | A.   2009. |
| 09:22:35 | 4 | Q.   And have you been in Pinal County -- County since |
| 09:22:41 | 5 | then? |
| 09:22:42 | 6 | A.   I've been in the same place, yes. |
| 09:22:44 | 7 | Q.   Did you review any documents to prepare for |
| 09:22:53 | 8 | today? |
| 09:22:53 | 9 | A.   Review any documents? |
| 09:22:55 | 10 | Q.   Yes, sir. |
| 09:22:56 | 11 | A.   No. |
| 09:22:59 | 12 | Q.   So as I previously mentioned, I represent |
| 09:23:11 | 13 | JPMorgan Chase.  And specifically, we're going to talk a |
| 09:23:14 | 14 | little bit about the account at issue in this matter. |
| 09:23:16 | 15 | Do you recall when you opened your Chase |
| 09:23:19 | 16 | Bank account ending in 8448? |
| 09:23:21 | 17 | A.   Well, I don't know the account number.  I mean, |
| 09:23:26 | 18 | that's not something that I commit to memory.  So I did |
| 09:23:29 | 19 | open an account at Chase, and specifically, I opened it up |
| 09:23:33 | 20 | for my social security because they don't send you a check |
| 09:23:36 | 21 | anymore.  You have to have a bank account and |
| 09:23:40 | 22 | direct-deposit it.  So that was the specific reason I |
| 09:23:45 | 23 | opened it. |
| 09:23:45 | 24 | Q.   For your social security benefits? |
| 09:23:47 | 25 | A.   And nothing else. |

09:25:57    1    benefits, right?

09:25:58    2        A.    Yes.

09:25:58    3        Q.    And it was likely either the San Tan Valley

09:26:00    4    branch or you said maybe Queen Creek, correct?

09:26:03    5        A.    It says here "San Tan Valley," so it prob- -- I

09:26:08    6    mean, they would know their address, I would think.

09:26:11    7        Q.    One would hope, right?

09:26:12    8        A.    Yes.

09:26:13    9        Q.    And then if you see down below, it says, "Type of

09:26:15   10    Ownership Individual - POD."

09:26:19   11        A.    Yes.

09:26:20   12        Q.    And do you understand that a POD account is a

09:26:23   13    payable on death account?

09:26:25   14        A.    Payable on death?

09:26:30   15        Q.    Correct.

09:26:31   16        A.    I don't know what -- know what that means.  You

09:26:33   17    mean like -- Oh, I see.  POD, I have my brother there.

09:26:37   18        Q.    So is that your brother, Robert Huffman?

09:26:40   19        A.    Robert, yeah.  So that means if I died, then

09:26:43   20    he -- he gets the money.  Is that what you mean by "POD"?

09:26:47   21        Q.    Correct.

09:26:47   22        A.    Okay.  I understand that.

09:26:48   23        Q.    And then if we look below that at the fine print

09:26:55   24    where it says "Acknowledgment" -- and I'll go ahead and

09:26:59   25    read that into the record -- it says, "By signing the

09:27:01   1   Signature Card, I am applying to the JPMorgan Chase Bank,

09:27:05   2   N.A., to open the deposit account and/or Chase Liquid

09:27:09   3   indicated above.  I certify that the information provided

09:27:12   4   hereon is true to the best of my knowledge and authorize

09:27:15   5   the Bank, at its discretion, to obtain credit reports and

09:27:19   6   employment verifications on me.  I acknowledge receipt of

09:27:23   7   the Bank's Deposit Account Agreement or other applicable

09:27:26   8   account agreement or the Chase Liquid Agreement, which

09:27:29   9   includes all provisions that apply to this deposit account

09:27:32   10  and/or Chase Liquid Card and the Bank Privacy Policy, and

09:27:36   11  agree to be bound -- bound by the terms and conditions

09:27:39   12  contained therein as amended from time to time."

09:27:43   13              Do you see that?

09:27:44   14      A.   I do.

09:27:44   15      Q.   So do you recognize that by opening your account,

09:27:47   16  you agreed to be bound by the bank's Deposit Account

09:27:50   17  Agreement?

09:27:50   18      A.   I -- I acknowledge that was there.  What I --  Do

09:27:57   19  I know what was in that agree- -- deposit agreement?  No.

09:28:01   20      Q.   And if we look at the next page, which is

09:28:10   21  Bates-labeled CHASE000098, we see that there's an

09:28:18   22  electronic signature for Bruce Huffman on 218-12-19

09:28:23   23  [verbatim]?  Do you see that?

09:28:27   24      A.   Oh, yeah, yeah.  Electronic signature, gotcha.

09:28:30   25      Q.   And that electronic signature was probably taken

| | | |
|---|---|---|
| 09:28:33 | 1 | when you opened the account in person at the branch, |
| | 2 | correct? |
| 09:28:37 | 3 | A.   I would assume. |
| 09:29:07 | 4 | MS. GORTON:  This is going to be marked |
| 09:29:08 | 5 | as Exhibit 2. |
| | 6 | (Deposition Exhibit 2 was marked for |
| 09:29:19 | 7 | identification.) |
| 09:29:19 | 8 | BY MS. GORTON: |
| 09:29:53 | 9 | Q.   And what I've handed to you, Mr. Huffman, which |
| 09:29:56 | 10 | is being marked as Exhibit 2, is a Chase Deposit Account |
| 09:29:59 | 11 | Agreement.  Do you see that on the first page? |
| 09:30:01 | 12 | A.   I do. |
| 09:30:02 | 13 | Q.   And if you see down below, right above the Bates |
| 09:30:06 | 14 | label, it says "Effective 11/11/2018." |
| 09:30:12 | 15 | A.   I see that. |
| 09:30:13 | 16 | Q.   Okay.  And if you look at CHASE000390 -- |
| 09:30:29 | 17 | A.   Okay. |
| 09:30:29 | 18 | Q.   -- right under the heading "Deposit Account |
| 09:30:32 | 19 | Agreement," if you can read that first line into the |
| 09:30:37 | 20 | record, please. |
| 09:30:38 | 21 | A.   "This agreement is the contract that governs your |
| 09:30:41 | 22 | account." |
| 09:30:42 | 23 | Q.   Okay.  And then it continues, "Whether you have a |
| 09:30:44 | 24 | personal or business deposit account, this document is the |
| 09:30:48 | 25 | basic agreement between you and us."  Then it's clarified |

09:53:12   1      Q.   Is that what you understand that to be?

09:53:14   2      A.   Yes.

09:53:15   3      Q.   And that was the only thing that you had

09:53:16   4  deposited into this account, right?

09:53:18   5      A.   That's the only thing I used this account for,

09:53:20   6  was my direct deposit social security, yeah.

09:53:22   7      Q.   Okay.  And we had previously established that you

09:53:24   8  deposit -- or I mean that you opened the account in

09:53:26   9  December of 2018, right?

09:53:28  10      A.   Correct.

09:53:29  11      Q.   Okay.  So there's about two years that this

09:53:32  12  account has been active at this time?

09:53:33  13      A.   Yes.

09:53:34  14      Q.   So about 24 months.

09:53:36  15           And did your amount that you were --

09:53:37  16  deposited stay the same or approximately the same, around

09:53:41  17  $2,000?

09:53:43  18      A.   You mean the amount that social security paid?

09:53:46  19      Q.   Correct.  The amount that was deposited into your

09:53:48  20  account by social security?

09:53:49  21      A.   There was --  Every -- every year they had a

09:53:53  22  cost-of-living adjustment, so whatever the percent was,

09:54:00  23  that's the amount that it increased.

09:54:03  24      Q.   Okay.  So we can average it out to about 2,000,

09:54:06  25  do you think?

| | | |
|---|---|---|
| 09:54:08 | 1 | A.   Well, it's over 2000 -- |
| | 2 | Q.   Right. |
| 09:54:10 | 3 | A.   -- I would think. |
| 09:54:11 | 4 | Q.   Okay.  So that's about 24 months of deposit at |
| 09:54:16 | 5 | this point at about 2,300 a month, so if my math's |
| 09:54:20 | 6 | correct, that's about almost exactly 55,200, right?  If |
| 09:54:25 | 7 | you need to do the math, go ahead.  I taught math for |
| 09:54:31 | 8 | three years and I still used a calculator for that. |
| 09:54:33 | 9 | A.   You know, I don't have a calculator here, |
| 09:54:35 | 10 | so . . . |
| 09:54:35 | 11 | Q.   Did you ever withdraw any of your social |
| 09:54:40 | 12 | security? |
| 09:54:40 | 13 | A.   I don't think I did. |
| 09:54:41 | 14 | Q.   Okay. |
| 09:54:41 | 15 | A.   Well, yes, there was one withdrawal.  And I can't |
| 09:54:46 | 16 | remember when that was or what the date was, but . . . |
| 09:54:48 | 17 | Q.   So maybe one time you withdrew funds? |
| 09:54:51 | 18 | A.   At least once, yeah. |
| 09:54:52 | 19 | Q.   Okay.  What was the purpose of keeping your funds |
| 09:54:57 | 20 | in this account? |
| 09:55:00 | 21 | A.   What do you mean? |
| 09:55:01 | 22 | Q.   So you had at this point accumulated $55,203.54. |
| 09:55:07 | 23 | It doesn't seem that -- that you were doing many |
| 09:55:09 | 24 | withdrawals, as you've just testified, that maybe you |
| 09:55:11 | 25 | withdrew once.  So were you saving this money for |

| | | |
|---|---|---|
| 09:55:15 | 1 | anything? |
| 09:55:15 | 2 | A.   Yes. |
| 09:55:16 | 3 | Q.   What were you saving it for? |
| 09:55:18 | 4 | A.   My retirement. |
| 09:55:20 | 5 | Q.   Okay.  And you were already retired at this |
| 09:55:22 | 6 | point? |
| 09:55:22 | 7 | A.   Well, semiretired, yeah.  I mean, I would do odd |
| 09:55:25 | 8 | jobs, as I told you before, so . . . |
| 09:55:26 | 9 | Q.   What odd jobs were you doing in December of 2020? |
| 09:55:29 | 10 | A.   Oh, like landscaping jobs, if somebody needed |
| 09:55:36 | 11 | work done, if somebody -- you know, handyman job, stuff |
| 09:55:43 | 12 | like that. |
| 09:55:44 | 13 | Q.   But you weren't living off of these funds that |
| 09:55:46 | 14 | were on deposit in this account, right? |
| 09:55:49 | 15 | A.   No.  I had other means of income. |
| 09:55:52 | 16 | Q.   Did you have other bank accounts at this time? |
| 09:55:55 | 17 | A.   I did. |
| 09:55:55 | 18 | Q.   Okay.  Did you have a retirement or pension from |
| 09:55:59 | 19 | any of your other previous employments? |
| 09:56:02 | 20 | A.   Retirement? |
| 09:56:03 | 21 | Q.   Uh-huh. |
| 09:56:04 | 22 | A.   Yes. |
| 09:56:04 | 23 | Q.   Do you have another retirement account? |
| 09:56:06 | 24 | A.   I do. |
| 09:56:09 | 25 | Q.   Who's that with? |

Bruce E. Huffman vs. JPMorgan Chase Bank                          2:22-cv-00903-JJT
Bruce Everett Huffman                    October 27, 2023                      104

| | | |
|---|---|---|
| 11:41:26 | 1 | A.   Right. |
| 11:41:26 | 2 | Q.   So you haven't used them? |
| 11:41:27 | 3 | A.   I'm still retired. |
| 11:41:28 | 4 | Q.   Right. |
| 11:41:29 | 5 | A.   Okay. |
| 11:41:30 | 6 | Q.   So can you explain to me what damages for the |
| 11:41:35 | 7 | loss of use are in your -- in your opinion? |
| 11:41:38 | 8 | A.   The ability to use it for whatever means you want |
| 11:41:43 | 9 | to use it for.  I mean, you could buy a car with it.  You |
| 11:41:46 | 10 | could pay bills. |
| 11:41:50 | 11 | Q.   Did you have plans to buy a car? |
| 11:41:52 | 12 | A.   At that point in time? |
| 11:41:54 | 13 | Q.   Uh-huh. |
| 11:41:55 | 14 | A.   Maybe.  I don't know. |
| | 15 | Q.   Did you -- |
| 11:41:56 | 16 | A.   I don't remember. |
| 11:41:56 | 17 | Q.   Did you approach any dealerships? |
| 11:41:58 | 18 | A.   I don't remember. |
| 11:41:59 | 19 | Q.   Were you denied a car because you didn't have use |
| 11:42:02 | 20 | of these funds? |
| 11:42:03 | 21 | A.   I don't -- I don't think so.  No. |
| 11:42:07 | 22 | Q.   Okay.  Were you using these funds to pay bills? |
| 11:42:09 | 23 | A.   Did I use those funds to pay bills? |
| 11:42:14 | 24 | Q.   Yes. |
| 11:42:14 | 25 | A.   No. |

| | | |
|---|---|---|
| 11:42:14 | 1 | Q.   Okay.  So you weren't going to use them to pay |
| 11:42:18 | 2 | bills during this? |
| 11:42:18 | 3 | A.   Are you talking about the $10,000 or the $60,000? |
| 11:42:21 | 4 | Q.   I'm talking about the $60,000.  It says damages |
| 11:42:24 | 5 | for the loss of use of the 60,597.20 from January 11th, |
| 11:42:30 | 6 | 2022, until March 21, 2022.  And what I'm trying to figure |
| 11:42:34 | 7 | out is what was your intent?  How were you going to use |
| 11:42:37 | 8 | those funds?  How were you damaged? |
| 11:42:38 | 9 | A.   I was --  Those funds were earmarked for my |
| 11:42:42 | 10 | retirement. |
| 11:42:43 | 11 | Q.   Did you have plans to use those funds from |
| 11:42:46 | 12 | January 11th, 2022, to March 21, 2022? |
| 11:42:50 | 13 | A.   Other than use it -- putting them in the bank? |
| 11:42:54 | 14 | Q.   Yes. |
| 11:42:55 | 15 | A.   I don't remember in 2021.  There was a point in |
| 11:42:59 | 16 | time where there was -- during COVID, that the stock |
| 11:43:08 | 17 | market had -- took a dump.  I mean, it was pretty low in a |
| 11:43:14 | 18 | lot of areas, so I had looked at stocks and was |
| 11:43:18 | 19 | contemplating putting some money into stocks. |
| 11:43:22 | 20 | Q.   And COVID occurred -- March 17th was when the |
| 11:43:25 | 21 | national emergency was -- was declared -- of 2020, |
| | 22 | correct? |
| 11:43:30 | 23 | A.   2020?  That sounds about right. |
| 11:43:32 | 24 | Q.   So that was two years prior to this, right? |
| 11:43:36 | 25 | A.   Yes. |

11:43:36   1      Q.   And did you use any of those funds to invest in

11:43:39   2   the stock market at that time?

11:43:40   3      A.   I didn't have access to those funds.

11:43:42   4      Q.   In March of 2020?

11:43:44   5      A.   Oh, March of 2020.  No.  But during that period

11:43:51   6   from 2020 to -- during the COVID situation, there were a

11:44:03   7   lot of -- blue-chip stocks is what I call them, like Ford

11:44:09   8   and Intuit and -- which I worked for, and General

11:44:19   9   Electric, some of the ones that I was looking at,

11:44:21  10   contemplating whether or not I should -- should take

11:44:25  11   advantage of the low stock price.

11:44:27  12      Q.   And when was that?

11:44:28  13      A.   It would have been during that COVID period.

11:44:30  14      Q.   What are you defining as the "COVID period"?

11:44:33  15      A.   Well, when the stock market really went down, so

11:44:38  16   I don't have exact dates.

11:44:39  17      Q.   Okay.

11:44:41  18      A.   But there were a lot of stocks that were just

11:44:43  19   bargain-basement price.

11:44:45  20      Q.   And is it your testimony that in January 11th,

11:44:51  21   2022, to March 21, 2022, you were looking at investing

11:44:56  22   stocks due to the COVID pandemic?

11:44:58  23      A.   I was considering it, yes.

11:45:00  24      Q.   Do you have any record of that?  Did you speak to

11:45:04  25   a broker?

Bruce E. Huffman vs. JPMorgan Chase Bank                                    2:22-cv-00903-JJT
Bruce Everett Huffman                    October 27, 2023                                 107

| 11:45:06 | 1 | A.   What do you mean? |
| 11:45:07 | 2 | Q.   In terms of investing stocks, how were you going |
| 11:45:08 | 3 | to do that? |
| 11:45:08 | 4 | A.   Self-directed. |
| 11:45:09 | 5 | Q.   Okay.  Did you open any brokerage account? |
| 11:45:12 | 6 | A.   I have brokerage accounts. |
| 11:45:14 | 7 | Q.   Okay.  And that's a self-directed account? |
| 11:45:15 | 8 | A.   Yes. |
| 11:45:15 | 9 | Q.   Okay.  And who's that with? |
| 11:45:17 | 10 | A.   I don't remember.  They -- it's a --  It's a |
| 11:45:25 | 11 | retirement account. |
| 11:45:26 | 12 | Q.   Is this the retirement account that you were |
| 11:45:30 | 13 | talking about earlier? |
| 11:45:31 | 14 | A.   Yes. |
| 11:45:32 | 15 | Q.   And you said that you do have statements |
| 11:45:37 | 16 | available for that that you could provide, correct? |
| 11:45:40 | 17 | A.   I think so. |
| 11:45:40 | 18 | Q.   And after this deposition, are you able to |
| 11:45:44 | 19 | collect those and provide those to your attorney so they |
| 11:45:47 | 20 | can be produced in this litigation? |
| 11:45:49 | 21 | A.   I believe so. |
|  | 22 | Q.   Okay. |
| 11:45:50 | 23 | A.   If I have them. |
| 11:45:51 | 24 | Q.   And if not, are you able to provide the entity |
| 11:45:54 | 25 | that they have so that we may issue a subpoena? |

| | | |
|---|---|---|
| 11:45:58 | 1 | A.   Oh, yeah, I can -- I can find out who it is. |
| 11:46:02 | 2 | Q.   And then the next cate- --  Is there any other |
| 11:46:04 | 3 | use that was contemplated between January 11, 2022, until |
| 11:46:08 | 4 | March 21, 2022, for these funds?  And when I say "these |
| 11:46:12 | 5 | funds," I mean the $60,597.20. |
| 11:46:15 | 6 | A.   Other than the stock market, I think that was the |
| 11:46:18 | 7 | only serious -- I mean, there may have been, you know, |
| 11:46:20 | 8 | other things that I considered, but I -- the stock |
| 11:46:23 | 9 | market -- |
| 11:46:24 | 10 | Q.   What other -- |
| 11:46:25 | 11 | I'm sorry, Mr. Huffman.  Go ahead. |
| 11:46:26 | 12 | A.   The stock market is the one that comes to mind. |
| 11:46:30 | 13 | Q.   But you had not previously used any of your |
| 11:46:32 | 14 | social security benefits to invest in the stock market |
| 11:46:38 | 15 | prior to this, right? |
| 11:46:38 | 16 | A.   No.  No. |
| 11:46:39 | 17 | Q.   The next category -- |
| 11:46:43 | 18 | Oh, I'm sorry.  And you said that there were |
| 11:46:44 | 19 | other things that you may have considered.  What are the |
| 11:46:46 | 20 | other things you may have considered? |
| 11:46:48 | 21 | A.   Real estate, but it's kind of hard to do that |
| 11:46:55 | 22 | when it's retirement funds.  You can't earmark it for -- |
| 11:46:59 | 23 | as retirement.  So . . . |
| 11:47:02 | 24 | Q.   So how were you planning on using the funds to |
| 11:47:06 | 25 | invest in real estate? |

11:47:08    1        A.    Find something that's a really good deal and make

11:47:10    2    a down payment with it.

11:47:11    3        Q.    Did you find any houses or any properties that

11:47:14    4    you were interested in investing in that you were

11:47:16    5    precluded from doing so because these funds were on hold?

11:47:20    6        A.    I -- I don't recall anything specifically, but I

11:47:23    7    was always looking at real estate prices and homes.  I get

11:47:27    8    emails from various real estate things like Redfin and --

11:47:39    9    there's another one I can't remember the name of it, but I

11:47:42   10    get emails from these real estate places.

11:47:49   11        Q.    Were you working with a real estate agent or a

11:47:52   12    broker?

11:47:52   13        A.    At that point in time?

11:47:54   14        Q.    Yes, sir.  And that point in time being

11:47:56   15    January 11, 2022, to March 21st, 2022.

11:47:59   16        A.    I don't think so.  They -- but they --  When they

11:48:01   17    send you that stuff, like Redfin and places like that,

11:48:05   18    they -- they have a phone number where you can con- -- if

11:48:07   19    you're interested in something, you can contact them and

11:48:10   20    then they can show you the property and . . .

11:48:12   21        Q.    Did you contact anyone in relation to any

11:48:14   22    specific property?

11:48:15   23        A.    I don't think --  Well, I may have inquired about

11:48:18   24    some, but I don't remember anything specifically.

11:48:20   25        Q.    Would you have records of those inquiries?

Bruce E. Huffman vs. JPMorgan Chase Bank                                    2:22-cv-00903-JJT
Bruce Everett Huffman                        October 27, 2023                          110

| | | |
|---|---|---|
| 11:48:25 | 1 | A.   Probably not. |
| 11:48:30 | 2 | Q.   Would you have called a phone number? |
| 11:48:32 | 3 | A.   I may have.  I don't -- I don't know.  I mean, |
| 11:48:41 | 4 | it's been a long time.  So . . . |
| 11:48:42 | 5 | Q.   And you said you'd be able to provide your phone |
| 11:48:47 | 6 | records, right? |
| 11:48:48 | 7 | A.   Sure. |
| 11:48:48 | 8 | Q.   Anything else besides the stock market and |
| 11:48:55 | 9 | potential real estate investments that you were looking at |
| 11:48:58 | 10 | for possible use of these funds? |
| 11:49:02 | 11 | A.   That's the only two that come to mind. |
| 11:49:04 | 12 | Q.   Speaking of the real estate investments, did you |
| 11:49:06 | 13 | put in any offers on any properties at this time? |
| 11:49:09 | 14 | A.   I don't --  During March -- January through |
| 11:49:13 | 15 | March? |
| 11:49:14 | 16 | Q.   Correct. |
| 11:49:14 | 17 | A.   I don't think so. |
| 11:49:14 | 18 | Q.   Okay.  Were you denied a property because you |
| 11:49:16 | 19 | didn't have use of these funds? |
| 11:49:17 | 20 | A.   If -- if I didn't make an offer, I wouldn't have |
| 11:49:22 | 21 | been denied, so yeah, I don't think so. |
| 11:49:24 | 22 | Q.   Do you have any other current real estate |
| 11:49:26 | 23 | holdings? |
| 11:49:27 | 24 | A.   Yes, I do. |
| 11:49:31 | 25 | Q.   Okay.  What are those? |

11:49:33   1      A.   There's a -- some real estate up in Reno.

11:49:40   2      Q.   And when did you purchase that property?

11:49:43   3      A.   Long time ago.  I don't remember.

11:49:53   4      Q.   Was it sometime in the 2000s?

11:49:55   5      A.   I think it was during the 2000s, yeah.

           6      Q.   Time period --

11:50:00   7      A.   Wait a minute.

11:50:01   8      Q.   I'm sorry.

11:50:02   9      A.   Yeah, I think it was during the 2000s.

11:50:05  10      Q.   Time period of 2000 --

11:50:07  11      A.   2000.

          12      Q.   I'm sorry.  Go ahead.

          13      A.   20-some years.

11:50:09  14      Q.   In the last 20 years?

11:50:10  15      A.   Yeah.

11:50:10  16      Q.   Okay.  Anything else other than the real estate

11:50:14  17   property in Reno?

11:50:15  18      A.   Anything what?

11:50:17  19      Q.   Any other property other -- other than the real

11:50:19  20   estate property in Reno?

11:50:20  21      A.   No.

11:50:21  22      Q.   So when's the last time that you invested in real

11:50:26  23   estate?

11:50:26  24      A.   Well, I bought my house.

11:50:28  25      Q.   And that was in 2009?

Bruce E. Huffman vs. JPMorgan Chase Bank                              2:22-cv-00903-JJT
Bruce Everett Huffman                    October 27, 2023                          112

| | | |
|---|---|---|
| 11:50:30 | 1 | A.   Yeah, 2009. |
| 11:50:34 | 2 | Q.   But that's your property, right?  That's where |
| 11:50:37 | 3 | you live? |
| 11:50:37 | 4 | A.   That's where I live, right. |
| 11:50:39 | 5 | Q.   Any other real estate investment properties? |
| 11:50:43 | 6 | A.   No. |
| 11:50:44 | 7 | Q.   Okay. |
| 11:50:45 | 8 | A.   Well, no.  I don't -- No.  I don't --  That are |
| 11:50:51 | 9 | in my name? |
| 11:50:53 | 10 | Q.   Or that you have an interest in. |
| 11:51:00 | 11 | A.   Well, my mom owns some -- my mom and dad own some |
| 11:51:04 | 12 | properties that I -- and I told you about that -- that I |
| 11:51:07 | 13 | manage.  So . . . |
| 11:51:07 | 14 | Q.   Do you have an interest in those properties? |
| 11:51:10 | 15 | A.   Sure.  I'm -- I'm their son, so . . . |
| 11:51:13 | 16 | Q.   Other than a familial interest, do you have -- |
| 11:51:17 | 17 | are you on the deed? |
| 11:51:17 | 18 | A.   No. |
| 11:51:18 | 19 | Q.   Is it held in a trust of which you will benefit |
| 11:51:22 | 20 | from? |
| 11:51:22 | 21 | A.   Am I --  I'm not on the deed, no. |
| 11:51:24 | 22 | Q.   So other than the real estate property in Reno |
| 11:51:26 | 23 | which you purchased maybe in the last 20 years or so, you |
| 11:51:29 | 24 | don't have any other real estate investment holdings? |
| 11:51:31 | 25 | A.   No. |

| | | |
|---|---|---|
| 11:51:32 | 1 | Q.   Okay.  And that real estate property in Reno, is |
| 11:51:37 | 2 | that a commercial or residential property? |
| 11:51:38 | 3 | A.   It's just a lot, unimproved lot. |
| 11:51:41 | 4 | Q.   The next --  Anything else other than the stock |
| 11:51:48 | 5 | market and potential real estate investments? |
| 11:51:51 | 6 | A.   That I was interested in purchasing? |
| 11:51:53 | 7 | Q.   That you may have -- |
| 11:51:54 | 8 | A.   That's all I can think of. |
| 11:51:56 | 9 | Q.   Okay.  The next category of damages is |
| 11:51:58 | 10 | compensation for the mental stress and anguish suffered as |
| 11:52:01 | 11 | a result of defendants' contact -- conduct.  Do you see |
| 11:52:04 | 12 | that? |
| 11:52:05 | 13 | A.   I do. |
| 11:52:05 | 14 | Q.   Okay.  How do you quantify that? |
| 11:52:08 | 15 | A.   How do I what? |
| 11:52:10 | 16 | Q.   How do you quantify that? |
| 11:52:12 | 17 | A.   What does that mean? |
| 11:52:13 | 18 | Q.   Well, you're requesting damages for mental stress |
| 11:52:18 | 19 | and anguish.  And my question is how is that quantified? |
| 11:52:20 | 20 | A.   I -- I don't understand your question. |
| 11:52:21 | 21 | Q.   Okay.  Did you seek any medical care for your |
| 11:52:23 | 22 | mental stress and anguish? |
| 11:52:25 | 23 | A.   Well, I've seen the VA.  I mean, I -- I'm a |
| 11:52:30 | 24 | veteran, so I go to the VA. |
| 11:52:32 | 25 | Q.   Okay.  When's the last time you went to the VA? |

| | | |
|---|---|---|
| 11:52:35 | 1 | A.   Whenever they -- they set up appointments. |
| 11:52:41 | 2 | Q.   And have you been diagnosed with anything from |
| 11:52:42 | 3 | the VA in terms of mental stress and anguish? |
| 11:52:45 | 4 | A.   Yes, I have. |
| 11:52:46 | 5 | Q.   Okay.  If you can go to page 4 of this. |
| 11:52:50 | 6 | A.   Page 4? |
| 11:52:51 | 7 | Q.   Yes.  Page 4 of Exhibit -- |
| 11:52:55 | 8 | MS. GORTON:  What number are we on?  14? |
| 11:52:58 | 9 | MR. McLAUGHLIN:  Correct. |
| 11:52:58 | 10 | BY MS. GORTON: |
| 11:53:03 | 11 | Q.   Interrogatory -- Interrogatory Number 5 asked -- |
| 11:53:08 | 12 | related to your complaint allegation that you suffered |
| 11:53:12 | 13 | anguish, fright, nervousness, grief, anxiety, worry, |
| 11:53:12 | 14 | shock, humiliation, and shame because of the actions of |
| 11:53:16 | 15 | the -- of Chase.  It then asked you to identify each |
| 11:53:19 | 16 | medical condition you experienced from January 1, 2021, to |
| 11:53:22 | 17 | present, including but not limited to medical conditions |
| 11:53:25 | 18 | you allege to have been caused by Chase.  And then it goes |
| 11:53:29 | 19 | on to ask for more specifics. |
| 11:53:31 | 20 | Your attorneys, on behalf of your -- on your |
| 11:53:35 | 21 | behalf, objected and then said that, again, you suffered |
| 11:53:40 | 22 | anguish, fright, nervousness, grief, anxiety, worry, |
| 11:53:43 | 23 | shock, humiliation, loss of sleep, and shame due to |
| 11:53:48 | 24 | Chase's actions, so just reiterating the allegations.  And |
| 11:53:52 | 25 | then states that you did not receive medical treatment for |

| | | |
|---|---|---|
| 11:53:55 | 1 | any medical condition caused by Chase.  Is that an |
| 11:53:58 | 2 | accurate statement? |
| 11:53:59 | 3 | A.   I think so.  Yeah, I didn't --  I mean, they |
| 11:54:01 | 4 | didn't prescribe anything for me.  You know, I see them |
| 11:54:03 | 5 | periodically.  They ask me what's going on in my life and |
| 11:54:07 | 6 | I tell them.  And -- and I may have told them about my |
| 11:54:11 | 7 | social security being garnished.  And -- and so those |
| 11:54:15 | 8 | types of discussions are -- you know, take place.  Whether |
| 11:54:19 | 9 | they noted it in the file, I don't know. |
| 11:54:21 | 10 | Q.   Do you have those files available to you? |
| 11:54:24 | 11 | A.   I don't, no.  The VA has them. |
| 11:54:26 | 12 | Q.   But they're your medical records, right?  So you |
| 11:54:29 | 13 | could -- |
| 11:54:30 | 14 | A.   That's -- that's correct. |
| 11:54:30 | 15 | Q.   Okay.  And you stated that you may have discussed |
| 11:54:35 | 16 | this matter with your medical providers? |
| 11:54:37 | 17 | A.   They ask me what's going in my life and I tell |
| 11:54:40 | 18 | them. |
| | 19 | Q.   Okay. |
| 11:54:42 | 20 | A.   And that would have been something that I would |
| 11:54:44 | 21 | have, had I --  if I had an examination during that period |
| 11:54:48 | 22 | of time, I would have told them about it. |
| 11:54:51 | 23 | Q.   Okay.  So your medical records have information |
| 11:54:53 | 24 | that may be relevant to this matter? |
| 11:54:55 | 25 | A.   Yeah.  I -- I don't know. |

11:54:56   1      Q.   Well, you discussed this matter with your medical

11:54:59   2   providers?

11:55:00   3      A.   Yeah, I don't know what they noted.  You know,

11:55:02   4   they -- they may -- they put down things sometimes.

11:55:05   5   Sometimes they don't.  It's just a verbal discussion a lot

11:55:09   6   of times.  So whether they noted it in the file -- so I

11:55:12   7   have no idea.

11:55:12   8      Q.   Okay.  So you don't know one -- one way or

11:55:14   9   another whether they're noted in your medical files?

11:55:17   10      A.   That is correct.

11:55:17   11      Q.   But you did discuss this matter with your medical

11:55:20   12   providers?

11:55:20   13      A.   I would have -- I would have discussed anything

11:55:22   14   that was happening in my life, because they always ask you

11:55:25   15   that.

11:55:25   16      Q.   Okay.  But you were not diagnosed with any

11:55:27   17   medical condition as a result of Chase's conduct, right?

11:55:30   18      A.   That's correct.

11:55:31   19      Q.   Okay.  Next category is that you seek

11:55:35   20   compensation for attorneys' fees and costs incurred in the

11:55:38   21   Pinal County action in an effort to free your funds.  What

11:55:44   22   was Chase's involvement, other than as the garnishee, in

11:55:49   23   the Pinal County action?

11:55:51   24      A.   Say that again.

11:55:52   25      Q.   What was Chase's role in the under- -- in the

| | | |
|---|---|---|
| 11:55:55 | 1 | Pinal County action other than as a garnishee? |
| 11:55:59 | 2 | A.   One more time? |
| 11:56:08 | 3 | Q.   Yeah.   What was Chase's role in the Pinal County |
| 11:56:11 | 4 | action other than as a garnishee? |
| 11:56:13 | 5 | A.   Withholding my funds and not releasing them. |
| 11:56:16 | 6 | Q.   So its only role was that of a garnishee? |
| 11:56:21 | 7 | A.   I don't know if that's accurate, saying they were |
| 11:56:27 | 8 | only -- it was only related to being them -- them being a |
| 11:56:31 | 9 | garnishee.   They were holding my funds and they wouldn't |
| 11:56:33 | 10 | release them.   That was -- |
| 11:56:35 | 11 | Q.   So this says attorneys' fees and costs incurred |
| 11:56:38 | 12 | in the Pinal County action in an effort to free your |
| 11:56:43 | 13 | funds. |
| 11:56:43 | 14 | A.   Right.   They wouldn't release my funds. |
| 11:56:45 | 15 | Q.   So you freed, according to you, your funds when? |
| 11:56:47 | 16 | A.   January -- |
| 11:56:51 | 17 | Q.   11th? |
| 11:56:51 | 18 | A.   I contacted them when I got the garnishment and I |
| 11:56:54 | 19 | said, "Look, social security funds -- you know, it's -- |
| 11:56:57 | 20 | social security funds are not subject to garnishment. |
| 11:56:59 | 21 | Release them."   And they wouldn't.   I talked to that 800 |
| 11:57:04 | 22 | number or whatever it was, and I think it was in |
| 11:57:08 | 23 | Louisiana -- New Orleans comes to mind -- and they said |
| 11:57:13 | 24 | they would get back to me.   Never did. |
| 11:57:15 | 25 | Q.   And, Mr. Huffman, you're aware that in this |

| | | |
|---|---|---|
| 11:57:18 | 1 | matter, the Court has already ruled that Chase doesn't |
| 11:57:20 | 2 | have any liability prior to January 11th, 2022, right? |
| 11:57:27 | 3 | A.   I -- |
| 11:57:27 | 4 | MR. MILLS:  I'll object to the form. |
| 11:57:33 | 5 | Answer, if you can. |
| 11:57:34 | 6 | THE WITNESS:  I -- I don't know. |
| 11:57:35 | 7 | BY MS. GORTON: |
| 11:57:35 | 8 | Q.   So you're not aware of that? |
| 11:57:36 | 9 | A.   I don't know. |
| 11:57:37 | 10 | Q.   So prior to January 11th, 2022, which is the date |
| 11:57:44 | 11 | that you said that you freed your -- that you freed your |
| 11:57:46 | 12 | funds, what was Chase's action other than as a |
| 11:57:49 | 13 | garnishee -- or Chase's role in the action other than as a |
| 11:57:54 | 14 | garnishee? |
| 11:57:55 | 15 | A.   January 11th is the date that the judge ruled |
| 11:57:58 | 16 | that they weren't subject to garnishment. |
| 11:58:01 | 17 | Q.   Okay.  And that was the date that, according to |
| 11:58:03 | 18 | you, you freed your funds? |
| 11:58:05 | 19 | A.   That's the date that I -- they should have been |
| 11:58:10 | 20 | released or within a short period thereafter. |
| 11:58:13 | 21 | Q.   Okay.  So then after that date, what attorneys' |
| 11:58:16 | 22 | fees and costs did you incur? |
| 11:58:19 | 23 | A.   Oh, I don't know how he -- I don't know --  My -- |
| 11:58:26 | 24 | my attorney would know exactly what, you know, was |
| 11:58:29 | 25 | incurred for what particular day.  I've never received a |

| | | |
|---|---|---|
| 11:58:32 | 1 | detailed billing from him, so I don't know.  I received a |
| 11:58:35 | 2 | final billing. |
| 11:58:37 | 3 | Q.   And do you have that final billing available? |
| 11:58:39 | 4 | A.   I don't know if he sent that via email or if it |
| 11:58:44 | 5 | was --  I think it's probably an email. |
| | 6 | Q.   Would you be able to -- |
| 11:58:50 | 7 | A.   It's just a flat amount, said you owe $5,000 or |
| 11:58:56 | 8 | whatever it was.  And I paid them a retainer, so maybe it |
| 11:58:58 | 9 | was $6,000.  I don't know. |
| 11:59:00 | 10 | Q.   Are you able to retrieve your billing information |
| 11:59:06 | 11 | from your prior attorney, Mr. -- is it Bybee or -- Bybee? |
| 11:59:11 | 12 | A.   Bybee.  B-u-y- -- Bybee -- b-e-e, I think.  Well, |
| 11:59:16 | 13 | you have it on one of those. |
| 11:59:18 | 14 | Q.   Right.  I think it's B-y-b-e-e. |
| | 15 | A.   Okay. |
| 11:59:21 | 16 | Q.   Are you able to retrieve your billing entries |
| 11:59:24 | 17 | from him? |
| 11:59:24 | 18 | A.   My billing what? |
| 11:59:26 | 19 | Q.   Your -- the billing invoices that you received |
| 11:59:27 | 20 | from him? |
| 11:59:28 | 21 | A.   I don't think I received an invoice.  I received |
| 11:59:30 | 22 | something that said I owe X amount of dollars, so -- and |
| 11:59:34 | 23 | it may have been via email. |
| 11:59:36 | 24 | Q.   And as an attorney -- or previously trained as an |
| 11:59:39 | 25 | attorney or practicing attorney, you understand that |

| | | |
|---|---|---|
| 11:59:42 | 1 | attorneys usually keep pretty accurate records of their |
| 11:59:45 | 2 | time and billing entries, right? |
| 11:59:47 | 3 | A.   I would hope so.  And I think I even asked for a |
| 11:59:49 | 4 | detailed billing. |
| 11:59:50 | 5 | Q.   Okay.  So would you be able to provide that or |
| 11:59:52 | 6 | ask your attorney for -- |
| 11:59:53 | 7 | A.   I didn't get a detailed billing. |
| 11:59:55 | 8 | Q.   Okay.  So we can subpoena him for a detailed |
| 11:59:58 | 9 | billing? |
| 11:59:58 | 10 | A.   I guess you can. |
| 11:59:59 | 11 | Q.   Other than these three categories that were |
| 12:00:12 | 12 | enumerated and the discussions that we've had, are there |
| 12:00:15 | 13 | any other damages that you allege were incurred as a |
| 12:00:18 | 14 | result of Chase's conduct? |
| 12:00:19 | 15 | A.   I don't think so. |
| 12:00:21 | 16 | MS. GORTON:  Okay.  And I think I am done |
| 12:00:22 | 17 | for now.  I may have some questions later.  But I think |
| 12:00:27 | 18 | Mr. McLaughlin here might have some questions for you. |
| 12:00:30 | 19 | MR. McLAUGHLIN:  I do.  It's been a little |
| 12:00:33 | 20 | bit less than an hour.  We can either start now or take a |
| 12:00:35 | 21 | break.  Whatever you all want. |
| 12:00:37 | 22 | MS. GORTON:  It's up to you, Mr. Huffman. |
| 12:00:39 | 23 | MR. MILLS:  Do you need a break or -- |
| 12:00:40 | 24 | THE WITNESS:  No.  I'm fine. |
| | 25 | MR. MILLS:  Okay. |

# EXHIBIT 18

1  Robert T. Mills (Arizona Bar #018853)
    Sean A. Woods (Arizona Bar #028930)
2  **MILLS + WOODS LAW, PLLC**
    5055 North 12th Street, Suite 101
3  Phoenix, Arizona 85014
    Telephone 480.999.4556
4  docket@millsandwoods.com
    rmills@millsandwoods.com
5  swoods@millsandwoods.com
    *Attorneys for Plaintiff*



Exhibit 14
Name: *Huffman*
Meri Coash 10-27-23

6

7          **IN THE UNITED STATES DISTRICT COURT**

8          **IN AND FOR THE DISTRICT OF ARIZONA**

9  Bruce E. Huffman,         Case No.: 2:22-cv-00903-PHX-JJT

10        Plaintiff,
                       **PLAINTIFF'S RESPONSE TO**
11      vs.             **DEFENDANT JPMORGAN CHASE**
                       **BANK, N.A.'S FIRST SET OF**
12  JP Morgan Chase Bank, N.A.; *et al.*,   **INTERROGATORIES TO**
                          **PLAINTIFF**
13        Defendants.

14

15                   (Assigned to the Honorable John J.
                          Tuchi)

16

17      Through counsel undersigned and pursuant to Fed. R. Civ. P. 33, Plaintiff Bruce E.

18  Huffman ("Plaintiff") hereby responds to *Defendant JPMorgan Chase Bank, N.A.'s First*

19
20  *Set of Interrogatories to Plaintiff*, served upon him by Defendant JPMorgan Chase Bank,

21  N.A. ("Chase"), as follows:

22  **INTERROGATORY NO. 1: Identify the factual and legal basis for the allegation in**

23  **paragraph 36 of Your Complaint that Chase's actions were "intentional, malicious,**
24
    **and reckless[,]" and identify any document or other source where any such basis is**
25
26  **found.**

27  **RESPONSE:** On January 11, 2022, the Pinal County Superior Court, in Case No.

28  S1100CV201501738, granted Plaintiff's Motion for Reconsideration and ruled that the

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

$60,597.25 held by garnishee Chase were Plaintiff's Social Security funds that were exempt from garnishment. (HUFFMAN-000198–HUFFMAN-000199.) That court mailed a copy of that ruling to Chase that same day, (HUFFMAN-000199), thus putting Chase on notice at or about that time that Chase was unlawfully withholding those funds from Plaintiff.

Moreover, Plaintiff subsequently notified Chase numerous times that Chase was unlawfully withholding money from him pursuant to the court's order, and demanded Chase release those funds to him as soon as possible. Plaintiff emailed Chase, attaching copies of the court's order, on January 20, 2022, February 4, 2022, February 7, 2022, February 8, 2022, and February 16, 2022. (*See* HUFFMAN-000202–HUFFMAN-000208.) Plaintiff continued to follow up with Chase, emailing it again on February 16, 2002, and subsequently on March 2, 2022 and March 9, 2022, to demand it release his funds to him, all to no avail. (*See* HUFFMAN-000209–HUFFMAN-000212.)

Nevertheless, despite the abundant and repeated notice of the court's order it received as set forth above, Chase did not release Plaintiff's funds to him until March 21, 2022, more than two (2) months after the order was issued. (*See* HUFFMAN-000001–HUFFMAN-000016.)

**INTERROGATORY NO. 2: Identify the factual and legal basis for the allegation in paragraph 36 of Your Complaint that Chase's "actions prevented [You] from accessing $60,597.20 that lawfully belong to" You and identify any document or other source where any such basis is found.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1  **RESPONSE:** Plaintiff incorporates his Response to Interrogatory No. 1 above as if fully

2  set forth herein.

3
4  **INTERROGATORY NO. 3:** **Identify the name, last known home and/or business**

5  **address(es), last known telephone number(s), and last known email address(es) of**

6  **each and every individual whom you believe has information relevant to (either in**

7  **support of or contrary to) or with whom you have spoken about the claims in this**

8
9  **matter, including but not limited to your allegations of (a) severe emotional distress,**

10 **including suffering, anguish, fright, nervousness, grief, anxiety, worry, shock,**

11 **humiliation, and shame. (Complaint, ¶ 69), (b) Chase's conduct as a substantial factor**

12 **of Your severe emotional distress (*Id.* at ¶70), and (c) your alleged damages including**

13 **"statutory damages, economic compensatory damages, noneconomic compensatory**

14 **damages, and attorneys' fees and costs" (*Id.* at ¶71).**

15
16 **RESPONSE:** Plaintiff objects to Interrogatory No. 3 on the grounds that it is overly broad,

17 unduly burdensome, and vague.  Subject to and without waiving those objections, Plaintiff

18 identifies the following individuals:

19
20 Sarah Crawley,                REDACTED              , REDACTED, email unknown

21 Harry Tyner,              REDACTED          ,       REDACTED       , phone calls

22 are not productive because he is extremely hard of hearing

23 Dan Wilcox, REDACTED, address and email unknown

24
25 Floyd  W.  Bybee,                       REDACTED              ,  REDACTED ,

26   REDACTED

27

28

3

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**INTERROGATORY NO. 4:** Identify the factual and legal basis for the allegation in paragraph 74 of Your Complaint that Chase was "able to reap certain benefits from making interest-bearing investment using [Your] money" and identify any document or other source where any such basis is found.

**RESPONSE:** Banks typically invest/re-lend depositor funds.

**INTERROGATORY NO. 5:** Your Complaint alleges that you have suffered "anguish, fright, nervousness, grief, anxiety, worry, shock, humiliation, and shame" because of the actions of Chase. Identify each medical condition (including mental health conditions) you experienced from January 1, 2021 to the present, including but not limited to, medical conditions you allege to have been caused by Chase. For each identified medical condition, please provide:

    **(a)** The name of the physician, psychiatrist, psychologist, or other professional that treated you;

    **(b)** Every hospital, clinic, rehabilitation center, nursing home, or other institution that examined, evaluated, tested, hospitalized, and/or treated you at any time for such medical condition;

    **(c)** The first and last date when you were examined, evaluated, tested, hospitalized, or treated by each medical provider for such condition; and

    **(d)** The reasons you were examined, evaluated, tested, hospitalized, or treated.

**RESPONSE:** Plaintiff objects to Interrogatory No. 5 on the grounds that it is overly broad, unduly burdensome, vague, and irrelevant to the claims and defenses in this action. Subject to and without waiving those objections, Plaintiff suffered anguish, fright, nervousness,

4

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

grief, anxiety, worry, shock, humiliation, loss of sleep, and shame due to Chase's actions. Plaintiff did not receive medical treatment for any medical condition caused by Chase.

**INTERROGATORY NO. 6: Identify each medical condition (including, but not limited to, any mental health conditions) you have experienced or with which you have been diagnosed in the last 10 years. For each identified medical condition, please provide:**

> **(a) The name of the physician, psychiatrist, psychologist, or other professional that treated you;**

> **(b) Every hospital, clinic, rehabilitation center, nursing home, or other institution that examined, evaluated, tested, hospitalized, and/or treated you at any time for such medical condition;**

> **(c) The first and last date when you were examined, evaluated, tested, hospitalized, or treated by each medical provider for such condition; and**

> **(d) The reasons you were examined, evaluated, tested, hospitalized, or treated.**

**RESPONSE:** Plaintiff hereby incorporates his Response to Interrogatory No. 5 above as if fully set forth herein.

**INTERROGATORY NO. 7: Provide a calculation of Your alleged damages in this matter that you contend were caused by Chase.**

**RESPONSE:** Pursuant to the Court's March 29, 2023 Order (Doc. 45), Plaintiff seeks damages for the loss of use of his $60,597.20 from January 11, 2022, the date the Pinal County Superior Court issued an order ruling that those funds were exempt from garnishment, until March 21, 2022, the date Chase finally released those funds to Plaintiff.

Plaintiff also seeks compensation for the mental stress and anguish he suffered as a result of Defendants' conduct. Plaintiff also seeks compensation for attorneys fees and costs incurred in the Pinal County action in an effort to free his funds.

**RESPECTFULLY SUBMITTED** this 13th day of October 2023.

**MILLS + WOODS LAW, PLLC**

By____/s/ Robert T. Mills_____
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
*Attorneys for Plaintiff*

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on October 13, 2023, I served the foregoing document via email

3   to the following:

4   Nicole M. Goodwin
    nicole.goodwin@gtlaw.com
5   Adrianna Griego Gorton
    gortona@gtlaw.com
6   **GREENBERG TRAURIG, LLP**
    2375 E Camelback Rd., Ste. 800
7   Phoenix, AZ 85016
8   *Attorneys for Defendant JPMorgan Chase Bank, N.A.*

9   Donald Wilson, Jr.
    dwj@bowwlaw.com
10  Jathan P. McLaughlin
    jpm@bowwlaw.com
11  **BROENING OBERT WOODS & WILSON, P.C.**
    2800 N Central Ave., Ste. 1600
12  Phoenix, AZ 85004
13  *Attorneys for Defendant Goodman Holmgren Law Group, LLP*

14  Tomio B. Narita
    tnarita@snllp.com
15  **SIMMONDS & NARITA, LLP**
    44 Montgomery St., Ste. 3010
16  San Francisco, CA 94104
    *Pro Hac Vice Attorneys for Defendant Goodman Holmgren Law Group, LLP*
17

18      _____/s/ Ben Dangerfield_____

19

20

21

22

23

24

25

26

27

28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1
2

## **VERIFICATION**

3    I, Bruce E. Huffman declare, under penalty of perjury, that the foregoing Responses

4  to Chase's First Set of Interrogatories to me are, to the best of my knowledge and

5  recollection, true and correct.

6
7    EXECUTED ON _Oct 13, 2023_____

8
                                    *Bruce Huffman*
9                                   Bruce Huffman (Oct 13, 2023 18:53 PDT)
                                    Bruce E. Huffman

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28